## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOYCE WEHRLE, *on behalf of herself and all others similarly situated*, <br><br> *Plaintiff*, <br><br> v. <br><br> McLAREN HEALTH CARE CORPORATION, <br><br> *Defendant*. | Case No. 2:25-cv-11420 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Joyce Wehrle, by and through her attorneys, for her Complaint against McLaren Health Care Corporation ("McLaren Health" or "Defendant"), alleges and states as follows, based on personal knowledge as to Plaintiff's own acts, and on information and belief as to all other matters, based on the investigation conducted by Plaintiff's counsel:

## INTRODUCTION

1. This is a class action lawsuit brought on behalf of individuals who used McLaren Health's website and whose private information Defendant therefore disclosed to third parties, without consent, through the use of tracking software embedded in Defendant's website.

1

2.    Plaintiff brings this case to address Defendant's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. ("Meta") and Google, Inc. ("Google"), without consent, through the use of tracking software embedded in Defendant's website.

3.    Defendant owns and controls https://www.mclaren.org/ ("Website"), which it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, and more.

4.    Unbeknownst to patients, going back years and continuing through at least December 2023, Defendant installed and maintained third-party tracking technologies such as the Meta Pixel and Google Analytics, and Google Tag Manager ("Tracking Tools") on its Website. These Tracking Tools track and collect patients' communications with the Defendant via the Website and surreptitiously force the patients' web browsers to send those communications to undisclosed third parties, such as Meta or Google.

5.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, inter alia: (i) implementing and then  failing to remove or disengage technology that was known and designed to share web-users'

2

information; (ii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook, Google or others; (iii) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools like the Meta Pixel, Google Analytics or CAPI; (iv) failing to warn Plaintiff and Class Members; and (v) otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

6.     As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of the Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

7.     Plaintiff seeks to remedy these harms and brings causes of action for (1) breach of fiduciary duty/confidentiality; (2) violation of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) – unauthorized interception, use, and disclosure; (3) invasion of privacy; (4) breach of implied contract; (5) unjust enrichment; (6) negligence; and (7) violation of the Michigan Nonprofit Health Care Corporation Reform Act, MCL § 550.1406.

## PARTIES

8.     Plaintiff Joyce Wehrle is a natural person and citizen of Michigan where she intends to remain.

3

9.     At all times relevant hereto, Plaintiff has been a patient of McLaren Health.

10.     Defendant McLaren Health Care Corporation is a Michigan-based Health Care Provider with its principal place of business located at 1 McLaren Parkway, Grand Blanc, Michigan 48439.

11.     Defendant serves a growing number of customers across Michigan (and a lesser number in bordering states), including through 12 hospitals, ambulatory surgery centers, imaging centers, a 640-member employed primary and specialty care physician network, commercial and Medicaid HMOs, home health, infusion and hospice providers, pharmacy services, a clinical laboratory network, and a wholly owned medical malpractice insurance company.[1]

12.     Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION & VENUE

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in

---

[1] About McLaren Health Care, https://www.mclaren.org/main/about-mclaren-health-care (last visited May 14, 2025).

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

14.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges one or more question(s) of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

15.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

16.     Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Federal Regulators and State Law Make Clear that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal

17.     The surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue.

18.     Defendant is a health care entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services (HHS) promulgated the "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule")

5

governing how health care providers must safeguard and protect Private Information. Under the Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

19.    And in recent years, both the Federal Trade Commission and the HHS Office for Civil Rights have reiterated the importance of and necessity for data security and privacy concerning health information.

20.    For instance, the FTC has engaged in numerous enforcement actions against companies operating health-related apps or websites.[2]

21.    In 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google and Criteo.[3]

---

[2] *See, e.g.*, *United States v. Easy Healthcare Corp.*, No. 1:23-cv-3107 (N.D. Ill. May 17, 2023); *In the Matter of BetterHelp, Inc.*, No. C-4796 (FTC Mar. 2, 2023); *United States v. GoodRx Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 1, 2023); *In the Matter of Flo Health, Inc.*, No. C-4747 (FTC June 17, 2021); *see also* Jill McKeon, *How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, Health IT Security (May 2, 2023), https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy.

[3] *United States v. GoodRx Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 17, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-

22.     Another FTC enforcement action, against online counseling service BetterHelp, resolved in a $7.8 million settlement based on allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes.[4]

23.     Meanwhile, the FTC submitted a stipulated order requiring Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[5]

---

breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale.").

[4] *In the Matter of BetterHelp, Inc.*, No. C-4796 (FTC July 7, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, FTC (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising.

[5] *United States v. Easy Healthcare Corp.*, No. 1:23-cv-3107 (N.D. Ill. June 22, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, FTC (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc.

24.    In July 2023, federal regulators sent a letter to 129 health care providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned that "[i]mpermissible disclosures of an individual's personal health information to third parties" could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[6]

25.    The federal regulators also warned that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."[7]

---

[6] Letter from Melaine Fontes Rainer, Director, Office for Civil Rights, U.S. Dept. of Health and Human Servs. & Samuel Levine, Director, Bureau of Consumer Protection, Federal Trade Comm., to 129 health care providers (July 20, 2023), https://www.hhs.gov/sites/default/files/ocr-ftc-letters-re-use-online-tracking-technologies.pdf.

[7] Id.

26.     Moreover, the HHS Office for Civil Rights has made clear, in a bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the transmission of such protected information violates the Privacy Rule:

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[8]

27.     The Bulletin points out the harms that such impermissible disclosure of an individual's PHI may cause patients, such as

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[9]

---

[8] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (footnotes omitted) (vacated in part by *American Hosp. Ass'n. v. Becerra*, No. 4:23-cv-01110-P, ECF No. 67 (S.D. Tex., Jun. 20, 2024), only to the extent that HIPAA obligations are triggered where online technology connects an IP address with an unauthenticated webpage addressing specific health conditions or healthcare providers).

[9] *Id.*

28.     State law likewise prohibits the disclosure of patients' Private Information.

29.     The Michigan Nonprofit Health Care Corporation Reform Act, MCL 550.1406, requires health care entities to provide reasonable care in securing their members' health care records from unauthorized access and to collect only personal data that is necessary for payment of claims, treatment and research. It further prohibits health care entities from disclosing any records containing personal data of any member without written notice and written consent of that member.

30.     Additionally, the Michigan Public Health Code states that a "patient or resident is entitled to confidential treatment of personal and medical records, and may refuse their release to a person outside the health facility or agency except as required because of a transfer to another health care facility, as required by law or third party payment contract, or as permitted or required under the health insurance portability and accountability act of 1996, Public Law 104-191, or regulations promulgated under that act, 45 CFR parts 160 and 164." MCL 333.20201(2)(c).

## B. Industry Standards Make Clear that Protecting Patient Data and Communications is the Duty of Health Care Companies

31.     A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

32.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

33.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

34.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

35.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

### C. Underlying Web Technology

36. To understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

37. Devices (such as computer, tablet, or smart phone) access web content through a web browser (e.g., Google's Chrome, Mozilla's Firefox, Apple's Safari, and Microsoft's Edge).

38. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' devices. These communications are facilitated by web browsers.

39. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses and their corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. "GET Requests" are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can store information on the client device that can later be communicated to a server. Cookies are sent from client devices to the host server along with HTTP Requests. Some cookies are "third-party cookies," which means they can store data from one

12

website and communicate it to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[10]

40. On a website, a user's HTTP Request essentially asks the website to retrieve certain information. The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on users' screens as they navigate a website.

41. Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

42. Source code may also quietly command a web browser to send data transmissions to third parties in the form of HTTP Requests executed in the background, without notifying the web browser's user.

43. Defendant's implementation of the Tracking Tools is source code that does just that. The Tracking Tools act much like a traditional wiretap. When patients

---

[10] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

visit Defendant's Website via an HTTP Request to McLaren Health Care Corporation's server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user, *along with* Source Code that includes the Tracking Tools. Thus, Defendant is in essence handing patients a tapped phone, and once the webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties, including Meta and Google.

44.    Third parties, like Meta and Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the patient associated with the Private Information intercepted.

45.    With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Private Information, like Meta, implement workarounds that savvy users cannot evade.  Meta's workaround is CAPI. CAPI is an effective workaround because it transmits information from Defendant's own servers and does not rely on the user's web browsers. It is designed to create a direct connection between a website host's marketing data and Meta. Thus, the communications between patients and Defendant, which are necessary to use Defendant's Website,

14

are received by Defendant and stored on its server before CAPI collects and sends the Private Information contained in those communications directly from Defendant to Meta. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

46.     While there is no way to confirm with certainty that a Website host like Defendant has implemented workarounds like CAPI without access to the host server, Meta instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and . . . share the same events using both tools." Such a "redundant event setup" allows Defendant "to share website events [with Meta] that the Pixel may lose" otherwise.[11] Thus, it is reasonable to infer that Meta's customers who implement the Meta Pixel in accordance with Meta documentation will also implement the CAPI workaround.

47.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive website content relating to the user's communications. Instead, these third parties are typically used to track user data and communications for marketing purposes of the website owner (i.e., to bolster profits).

---

[11]     *See   Best   Practices   –   Conversations   API*, Facebook, https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/ (last visited May 13, 2025).

48.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the user's communications to third parties.

49.     In this case, Defendant employed the Tracking Tools and CAPI to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Meta.

50.     By contrast, the Markup is the façade of a website and what the user sees.

51.     As an example, a patient's HTTP Request seeks specific information from the Defendant's Website (e.g., "Find a Physician" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

52.     When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels. The Meta Pixel is a tiny image file that is so small as to be invisible to website users. It is purposefully designed and camouflaged in this manner so that website users remain unaware of it.

53.    As   the   example   below   illustrates,   when   a   patient   visits https://www.mclaren.org and selects the "Find A Physician" button, the user only sees the Markup returned by the HTTP Response, not Defendant's Source Code, the underlying HTTP Requests and Responses, or the Meta Pixel.



54.    Behind the scenes and in the backdoor of the Website, however, tracking technologies like the Meta Pixel and the Google Analytics tracking tool are embedded in the Source code, automatically transmitting what the patient does on the webpage and effectively opening a hidden spying window into the patient's browser.

**D. Tracking Tools Collect Website Users' Private Information and Disclose it to Third Parties**

55.    Third parties, like Meta and Google, offer Tracking Tools as free software that companies can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and

activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

56.     In general, Tracking Tools are automatically configured to capture "Standard Events" like a user's visit to a particular webpage, that webpage's URL and metadata, button clicks, etc. Companies, such as Defendant, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website.

57.     When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party. For example, the Meta Pixel on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of the communication with the Website and send the duplicate from the user's browser directly to Facebook's server.

58.     Meta connects user data from Defendant's Website to the individual's Facebook ID (FID). The FID identifies a user's Facebook profile, which contains detailed information sufficient to identify the user personally.

59.     Meta tracks and collects data even on people who do not have a Facebook account or have deactivated their Facebook accounts. Those individuals can find themselves in an even worse situation because even though their Private Information is sent to Meta—without their consent—they cannot clear past activity

or disconnect the collection of future activity since they do not possess an account (or an active account).[12]

60.    Then, completely unencumbered by any pretense of restriction or regulation, Meta and Google, in turn, use that Private Information for various business purposes, including using such information to "improve" advertisers' ability to target specific demographics and selling such information to third-party marketers who target those users online (through their Facebook, Instagram, Gmail and other social media and personal accounts):

> Along with encouraging businesses to spend ad dollars, Facebook also receives the transmitted data, and can use it to hone its algorithms. Facebook can also use data from the pixel to link website visitors to their Facebook accounts, meaning businesses can reach the exact people who visited their sites. The pixel collects data regardless of whether the visitor has an account.[13]

---

[12] In the past, these were referenced as "ghost accounts" or "shadow profiles." *See* Laura Hautula, *Shadow profiles: Facebook has information you didn't hand over*, CNET (April 11, 2018), https://www.cnet.com/news/privacy/shadow-profiles-facebook-has-information-you-didnt-hand-over/.

[13] *See* Colin Lecher & Ross Teixeira, *Facebook Watches Teens Online As They Prep For College*, THE MARKUP (Nov. 22, 2023), https://themarkup.org/pixel-hunt/2023/11/22/facebook-watches-teens-online-as-they-prep-for-college ("Businesses embed the pixel on their own websites voluntarily, to gather enough information on their customers so they can advertise to them later on Meta's social platforms, Facebook and Instagram.").

61.    Simply put, the health information disclosed through the tracking technologies is personally identifiable.

62.    In addition to the Tracking Tools, upon information and belief Defendant also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website servers.[14]

63.    Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Meta, CAPI does not cause the user's browser to transmit information directly to Meta. Instead, CAPI tracks the user's website interaction (including Private Information), records and stores that information on the website owner's servers, and then transmits the data to Meta from the website owner's servers.[15]

64.    Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant

---

[14] Samir ElKamouny, *How To Implement Facebook Conversions API (in Shopify)*, Fetch&Funnel,          https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited May 12, 2025) ("Conversions API works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns.").

[15] *See Conversions API*, Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/ (last visited May 14, 2025) ("Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel. . . . This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.").

to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending website users' Private Information to Meta directly.

65.    The Google Analytics tracking tool is marginally different than the Meta Pixel but essentially accomplishes the same goal: tracking what a user communicates to Defendant's website.[16]

66.    Transmissions only occur on webpages that contain Tracking Tools. Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Meta or Google via this technology but for Defendant's decisions to install the Tracking Tools on its Website.

67.    The third parties to whom Defendant's Website transmits data through Tracking Tools and associated workarounds (e.g. CAPI) do not provide any substantive Website content relating to the patient's use of the Website. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to bolster profits).

---

[16]    *Comparing    Google    Analytics    vs    Facebook    Pixel*,    Boltic, https://www.boltic.io/blog/google-analytics-vs-facebook-pixel. (last visited May 13, 2025) ("Google Analytics and Facebook Pixel are both excellent tools for measuring website performance and user behavior.").

68.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

## E. Defendant Disclosed Plaintiff's and Class Members' Private Information to Meta and Google Using Tracking Tools

69.     Despite warnings from regulators, state law, and professional ethics, Defendant has embedded hidden Tracking Tools, including the Meta Pixel and Conversions API, as well as the Google Analytics tool, to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Meta and Google, essentially planting a bug on patients' web browsers that forced them disclose private and confidential communications to third parties.

70.     Defendant did not disclose the presence of these Tracking Tools to its patients and Website users.

71.     Defendant installed Meta Pixels during the relevant period, each of which has its own unique identifier (including without limitation Pixel id 4022392917856067), which can be used to identify which of Defendant's webpages contained the Meta Pixel.

72.     Defendant also installed Google Analytics and Google Tag Manager during the relevant period. Similarly, Defendant's Google Tracking Tools have

unique identifying numbers of their own, such as its GTM container with ID GTM-TR8BXWZ.

73.    Defendant utilized data from the Tracking Tools for marketing purposes to bolster its profits. Tracking Tools and CAPI are routinely used to target specific customers by using data and information from users' communications with a website to build profiles for the purposes of retargeting and future marketing. Meta and Google also use Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

74.    The information disclosed in this way by Defendant informs the third party (e.g., Meta and Google) that a specific patient was seeking confidential medical care. The third parties, in turn, sell Plaintiff's and Class Members' Private Information to third-party marketers who geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Tracking Tools.

75.    Because of these Tracking Tools, Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Meta and Google. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

76.   Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Meta or Google.

77.   Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Meta and Google to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

78.   The Tracking Tools allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Website does not rely on the Tracking Tools in order to function.

79.   While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

80.   Plaintiff and Class Members used the Website to submit information related to their past, present, or future health conditions, including, for example, searches for specific health conditions and treatment and the booking of medical appointments with specific physicians. Such Private Information would allow a third party to know that a specific patient was seeking confidential medical care from Defendant, as well as the type of medical care they sought.

24

81.    Plaintiff and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

82.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

83.    On information and belief, Defendant's Tracking Tools sent non-public Private Information to third parties like Meta and Google, including but not limited to Plaintiff's and Class Members': (1) health conditions; (2) desired medical treatment or therapies; (3) desired locations or facilities where treatment was sought; (4) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); (5) searched and selected physicians and their specialties conducted via the Website search bar; and (6) appointment scheduling activities.

84.    Importantly, the Private Information that Defendant's Tracking Tools sent to third parties included personally identifying information that allowed those third parties to connect the Private Information to a specific patient. Information sent to Meta was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), allowing individual patients' communications with Defendant—

and the Private Information contained in those communications—to be linked to their unique Facebook accounts and therefore their identity.

85. A Facebook ID is assigned to each person who has a Facebook account, and it is comprised of a unique and persistent set of numbers that can be easily used to look up that person's Facebook account by simply typing the numbers after www.facebook.com/ and hitting "Enter."

86. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

87. Similar to Facebook, information sent to Google was sent alongside the Plaintiff's and Class Members' unique identifier ("_ga" or "CID") , thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[17]

---

[17] *See Brown v. Google LLC*, No. 4:20-cv-3664-YGR, 2023 WL 5029899, at n.11

88.     Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.

89.     Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to unauthorized third parties; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

90.     By installing and implementing both Facebook tools and Google Analytics, Defendant caused Plaintiff's and Class Members' communications to be intercepted by and/or disclosed to Meta and Google and for those communications to be personally identifiable.

## F. Defendant's Tracking Tools Disseminate Patients' Private Information

91.     Tracking Tools that Defendant installed on its Website disseminated Plaintiff's and Class Members' private health information to third parties.

92.     If a patient used the Website to find a physician or other provider, Defendant's Website requested Private Information, including the particular doctor,

---

(Aug. 7, 2023) (quoting Google employee deposition testimony explaining how Google tracks user data).

specialty, or conditions the patient has or is seeking. Unbeknownst to the patient, each and every communication was sent to third parties, namely Meta and Google, via Defendant's Tracking Tools, including the physician the patient selects, the location of that physician, and any text or phrases the patient types into the search bar.

93.    Similarly, where a patient used the Website to set an appointment with a particular provider, the existence and details of that appointment was sent to third parties, namely Meta and Google, via Defendant's Tracking Tools.

94.    The user's website activity and the contents of the user's communications are sent to Facebook alongside their personally identifiable information. Several different methods allow marketers and third-parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into Facebook on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

95.    Facebook receives numerous cookies when Defendant's Website transmits information via the Pixel.

96.     The "fr" cookie contains an encrypted Facebook ID and browser identifier.[18] Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.[19]

97.     These cookies are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

98.     Defendant also revealed its Website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user.[20]

99.     Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike

---

[18] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit*, p. 33 (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[19] *Cookies & other storage technologies*, https://www.facebook.com/policy/cookies/ (last visited May 14, 2025).

[20] *Id.*

the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.[21]

100.   The Meta Pixel uses both first- and third-party cookies.

101.   In summary, Meta, at a minimum, uses the fr, _fbp, and c_user cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Meta even when they have disabled third-party cookies within their web browsers.

102.   At present, the full breadth of Defendant's tracking and data sharing practices is unclear, but other evidence suggests Defendant has been using additional Tracking Tools to transmit its patients' Private Information to additional third parties. For example, Plaintiff's counsels' investigation revealed that Defendant was also sending its patients' protected health information to Google via Google tracking tools including Google Analytics and/or Google Tag Manager.

103.   Defendant does not disclose that the Pixel, Google trackers, first-party cookies from third parties like Meta and Google, or any other Tracking Tools embedded in the Website's source code track, record, and transmit Plaintiff's and

---

[21] The _fbp cookie is always transmitted as a first-party cookie.

Class Members' *Private Information* to Meta and Google. Moreover, Defendant never received consent or written authorization to disclose Plaintiff's and Class Members' private communications to Meta or Google.

### G. Plaintiff-Specific Allegations

104. Plaintiff has been a patient of Defendant and has regularly used Defendant's Website since at least 2022.

105. As detailed herein, Plaintiff accessed Defendant's Website on her personal device and used the Website to look for providers, review conditions and treatments, make appointments and communicate with her providers.

106. As a condition of receiving Defendant's services, Plaintiff disclosed her Private Information to Defendant on numerous occasions, including at least once in each of the year 2022 and 2023.

107. Plaintiff accessed Defendant's Website on per personal devices to receive health care services from Defendant and at Defendant's direction.

108. Plaintiff has maintained an active Facebook account throughout the relevant period in this case, which she is perpetually logged into and which is registered under her legal name.

109. During the relevant time period, when the Defendant's Pixels were present, Plaintiff used Defendant's Website, without limitation, book her regular mammogram appointments.

31

110.   The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to Meta can only be determined through formal discovery. However, the configuration of Defendant's website was such that it necessarily caused the transmission of her private information as to these appointments and providers  intercepted at least the following communications about Plaintiff's prospective health care providers to third parties such as Meta.

111.   Contemporaneously with the interception and transmission of Plaintiff's communications on Defendant's website, Defendant also disclosed to Meta Plaintiff's personal identifiers, including but not limited to her IP address and Facebook ID.

112.   Plaintiff reasonably expected that her communications with Defendant via the Web Properties were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

113.   Plaintiff provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law

114.   Further to the systematic process described herein, Defendant assisted Meta with intercepting Plaintiff's communications, including those that contained personally identifiable information, protected health information and related confidential information.

115.   Defendant assisted these interceptions without Plaintiff's knowledge, consent or express written authorization.

116.   Following her visits to Defendant's Website, Plaintiff observed advertisements on her Facebook account related to the care she sought and received through medical providers she viewed on Defendant's Website, specifically relating to mammography.

117.   Plaintiff submitted medical information to Defendant via its Website. Because Defendant utilizes the Meta Pixel, the Website's Source Code sends a secret set of instructions back to the individual's browser, causing the Pixel to send Plaintiff's FID, the Pixel ID, and the webpage's URL to Meta.

118.   Pursuant to the systematic process described in this Complaint, Plaintiff's Private Information was disclosed to Meta, and this data included her PII, PHI, and related confidential information. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

119.   As Defendant's patient, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to a third party. But

for her status as Defendant's patient, Plaintiff would not have disclosed her Private Information to Defendant.

120.   During her time as a patient, Plaintiff never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Meta, to access or interpret such information.

121.   Notwithstanding, through the Pixel, other Tracking Tools and Conversions API, Defendant transmitted Plaintiff's Private Information to third parties, such as Meta and Google.

122.   Accordingly, during the same transmissions, the Website routinely provides Meta with its patients' FIDs, IP addresses, and/or device IDs or other information they input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires health care providers to anonymize to protect the privacy of patients.  Plaintiff's and Class Members identities could be easily determined based on the FID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

123.   After intercepting and collecting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Meta will associate the information that it collects from the visitor with a Facebook ID that identifies their

name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta— or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

124.   Based on the presence of the Pixel and Conversions API, Defendant unlawfully disclosed Plaintiff's Private Information to Meta. The presence of Facebook advertisements confirms Defendant's unlawful transmission of Plaintiff's Private Information to third parties including Meta.

125.   In sum, Defendant's Pixel transmitted Plaintiff's highly sensitive communications and Private Information to Facebook, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization

126.   Defendant breached Plaintiff's right to privacy and unlawfully disclosed her Private Information to Meta. Specifically, Plaintiff had a reasonable expectation of privacy, based on her status as Defendant's patient, that Defendant would not disclose her Private Information to third parties.

127.   Defendant did not inform Plaintiff that it shared her Private Information with Meta, Google, or any other third party.

128.   By doing so without Plaintiff's consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed Plaintiff's Private Information.

129.   Upon information and belief, as a "redundant" measure to ensure Plaintiff's Class Members' Private Information was successfully transmitted to third parties like Meta, Defendant implemented server-based workarounds like Conversions API to send Plaintiff's and Class Members' Private Information from electronic storage on Defendant's server directly to Facebook.

130.   Plaintiff suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendant via the Website.

131.   Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

132.   Plaintiff did not know (and had no way of reasonably knowing) that her Private Information was intercepted and unlawfully disclosed to Facebook because Defendant affirmatively prevented its patients from learning these facts.

**H. Plaintiff's and Class Members' Expectation of Privacy**

133.   Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

134.   Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

135.   Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's health care services, or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

**I.  Defendant Was Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures**

136.   The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was the use of patient data for advertising in the absence of express written consent, which amounts to criminal and tortious acts in violation of federal and state laws.

Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Meta in the form of enhanced advertising services and more cost-efficient marketing on its platform.

137.   Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

138.   Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

139.   By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Michigan law and the common law.

**J.  Plaintiff's and Class Members' Private Information Had Financial Value**

140.   Plaintiff's and Class Members' data and Private Information has economic value. Meta regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences, and then sells that information to

advertising clients. Google has recognized the value of user data and has even instituted a pilot program in which it pays users on a weekly basis to track them online.

141.   Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." One conservative estimate suggests that in 2018, companies earned $202 per American user from mining and selling data.[22] That figure is only due to keep increasing; another analysis suggests the data of U.S. residents was worth at least $700 in 2022, totalling hundreds of billions of dollars industry-wide.[23]

142.   The value of health data in particular is well-known. Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[24]

---

[22] Robert J. Shapiro, *What Your Data Is Really Worth to Facebook*, Washington Monthly (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/.
[23] *See* Ben Wolford, *What's your data really worth? (2025 update)*, Proton (Feb. 8, 2024), https://proton.me/blog/what-is-your-data-worth.
[24] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/.

143. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[25]

## CLASS ACTION ALLEGATIONS

144. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

145. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, used Defendant's Website and had their Private Information disclosed to a third party without authorization.

146. Plaintiff also seeks to represent a Michigan Subclass defined as:

> All individuals residing in Michigan who are, or were, patients of Defendant or any of its affiliates, used Defendant's Website, and had their Private Information disclosed to a third party without authorization or consent.

---

[25] Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited June 18, 2024).

The Nationwide Class and the Michigan Subclass are collectively referred to as the "Class."

147.   Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

148.   Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

149.   Numerosity, Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Meta and Google, and the Class is identifiable within Defendant's records.

150.   Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.   Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.   Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

41

c.　　Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

d.　　Whether Defendant breached its duties to Plaintiff and Class Members;

e.　　Whether Defendant's conduct violated the ECPA, 18 U.S.C. § 2511;

f.　　Whether Defendant's conduct invaded Plaintiff's and Class Members' privacy in violation of MCL 750.539j;

g.　　Whether Defendant's conduct breached an implied contract between Defendant and Plaintiff and Class Members;

h.　　Whether Defendant was unjustly enriched by disclosing Plaintiff's and Class Members' Private Information;

i.　　Whether Defendant was negligent;

j.　　Whether Defendant's conduct violated the Michigan Nonprofit Health Care Corporation Reform Act, MCL 550.140;

k.　　Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages because of Defendant's wrongful conduct; and

l.　　Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced because of Defendant's disclosure of their Private Information.

151.   <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised because of Defendant's incorporation of Tracking Technologies, due to Defendant's misfeasance.

152.   <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

153.   <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class

Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

154.   <u>Policies Generally Applicable to the Class</u>. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

155.   The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be

recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

156.   The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

157.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

158.   Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

159.   Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief regarding the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

160. <u>Issue Certification</u>, Fed. R. Civ. P. 23(c)(4). Likewise, issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to, the following:

a.      Whether Defendant owed a legal duty not to disclose Plaintiff's and Class Members' Private Information;

b.      Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.      Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.      Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f.      Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief because of Defendant's wrongful conduct.

## COUNT I
## BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
### (On Behalf of Plaintiff and the Class)

161.   Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

162.   Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information.  This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

163.   Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

164.   In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

165.   Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

166.   These disclosures were made for commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

167.   The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment.

168.   Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under those policies and procedures.

169.   The third-party recipients included, but may not be limited to, Meta and Google. Such information was received by these third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

170. Defendant's breach of the common law implied covenant of trust and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

a. By failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b. By failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. By failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members PHI;

e. By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g. By impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

h. By failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to

carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

i.  By failing to keep Private Information confidential as required by MCL 333.20201; and

j.  By otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

171.  The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of the essential confidential relationship between the health care provider and the patient.

172.  As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

a.  Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b.  Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c.  Defendant eroded the essential confidential nature of the provider-patient relationship;

d.  General damages for invasion of their rights in an amount to be determined by a jury;

e.  Nominal damages for each independent violation;

f.   Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g.   Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.   Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i.   Defendant's actions violated the property rights Plaintiff and Class members have in their Private Information.

**COUNT II**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiff and the Class)**

173.   Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

174.   The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

175.   The ECPA protects both sent and received communications.

176.   Plaintiff's and Class Members' interactions with McLaren Health's Website are electronic communications under the ECPA.

177.   By utilizing and embedding the Tracking Tools and CAPI on its Website and/or servers, McLaren Health intentionally intercepted, endeavored to

intercept and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

178. Specifically, McLaren Health intercepted Plaintiff's and Class Members' electronic communications via the Tracking Tools and CAPI, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' Private Information to Meta and Google.

179. Furthermore, Defendant intercepted the "contents" of Plaintiff's communications in at least the following forms:

    a. The parties to the communications;

    b. PII such as patients' IP addresses, Facebook IDs, cid parameter cookie, browser fingerprints and other unique identifiers;

    c. The precise text of patient communications about specific medical conditions;

    d. The details of information generated when patients requested or made appointments,

    e. The details of information generated when patients signed up for classes;

    f. The details of patient communications about billing and payment;

    g. The precise dates and times when patients click to Log-In on Defendant's Website.

180. McLaren Health intercepted communications that included, but are not limited to, communications to/from Plaintiff and Class Members regarding Private

Information, including their unique personal identifiers such as their Facebook ID, IP address, other unique personal identifiers and health information relevant to the appointments and classes in which Plaintiff and Class Members participated.

181.   Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools it embedded and operated on its Website, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Meta and Google.

182.   McLaren Health intentionally used wire or electronic communications to increase its profit margins. McLaren Health specifically used the Tracking Tools and Conversions API to track and utilize Plaintiff's and Class Members' Private Information for its own financial benefit.

183.   McLaren Health was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

184.   Plaintiff and Class Members did not authorize McLaren Health to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via the Tracking Tools including the Pixels and Conversions API.

185.   Any purported consent that McLaren Health received from Plaintiff and Class Members was not valid.

186.   Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State—namely, violations of HIPAA and invasion of privacy, among others.

187.   In sending and acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of McLaren Health's Website, looking up specific providers and/or treatments, and scheduling appointments, McLaren Health's purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation or matter that would be highly offensive to a reasonable person.

188.   McLaren Health's acquisition of patient communications that were used and disclosed to Meta and Google was also done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Michigan as well as various common law causes of action.

189.   Additionally, through the above-described tracking technologies and intercepted communications, this information was, in turn, used by Meta and Google to 1) place Plaintiff in specific health-related categories and 2) target Plaintiff with particular advertising associated with Plaintiff's specific health conditions.

190.   Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, health care providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiff or the Class Members;

d. Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiff's and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiff and Class Members intended to remain private no longer private.

191.   As a result of Defendant's violation of the ECPA, Plaintiff and Class Members entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT III
### INVASION OF PRIVACY
### Violations of MCL 750.539j
### (On Behalf of Plaintiff and the Class)

192.   Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

193.   Plaintiff and Class Members have a statutory privacy interest in their names, portraits, pictures, and voices under Michigan law.

194.   Defendant knowingly used Plaintiff's and Class Members' names and other Private Information in the State of Michigan for advertising and trade purposes without first obtaining their written consent.

195.   Specifically, Defendant transmitted Plaintiff's and Class Members' names and/or FID to third parties like Meta and Google for targeted advertising and other commercial purposes, as described herein.

196.   Defendant's use of Plaintiff's and Class Members' names and Private Information did not serve any public interest.

197.   The unlawful tracking of Plaintiff and Class Members' and disclosure of their names in connection with their Private Information has caused Plaintiff and Class Members to suffer damages. This includes damage to the value of their information, which Defendant appropriated for its own enrichment. Plaintiff and Class Members have also suffered nominal damages.

198.   Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed Tracking Tools onto its Website because the purpose of the Tracking Tools is to track and disseminate individuals' communications with the Website for the purpose of marketing and advertising.

199.   Because Defendant intentionally and willfully incorporated the Tracking Tools into its Website and encouraged patients to use that Website for

health care purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

200.   Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs. Alternatively, Plaintiff and Class Members are entitled to nominal damages.

201.   Plaintiff and Class Members are entitled to exemplary and/or punitive damages because of Defendant's knowing violations of their statutory rights to privacy.

202.   Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of third parties like Meta and Google, and the wrongful disclosure of the information cannot be undone.

203.   Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to third parties who, on information and belief continue, to possess and utilize that information.

204. Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into Plaintiff's and Class Members' statutory privacy interests.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (on behalf of Plaintiff and the Class)

205. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

206. As a condition of utilizing Defendant's Website and receiving services from Defendant's health care facilities and professionals, Plaintiff and the Class Members provided their Private Information and compensation for their medical care.

207. When Plaintiff and Class Members provided their Private Information to Defendant, they entered an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

208. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

209. Plaintiff and Class Members would not have retained Defendant to provide health care services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

210.   Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information without consent to third parties like Facebook and Google.

211.   As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

212.   Plaintiff and Class Members are entitled to compensatory and consequential damages because of Defendant's breach of implied contract.

### COUNT V
### UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Class)

213.   Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class and pleads this Count in the alternative.

214.   Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

215.   Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

216.   Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

217.   Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

218.   The benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

219.   Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VI
### NEGLIGENCE
**(On behalf of Plaintiff and the Class)**

220. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

221. Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

222. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

223. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

224. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

225. The third-party recipients included, but may not be limited to, Meta and Google.

226. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and

communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

## COUNT VII
## VIOLATIONS OF THE MICHIGAN NONPROFIT HEALTH CARE CORPORATION REFORM ACT
### MCL 550.140 *et seq.*
### (On behalf of Plaintiff and the Michigan Subclass)

227.   Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

228.   This cause of action is brought pursuant to the Michigan Nonprofit Health Care Corporation Reform Act (the "Reform Act"), MCL § 550.140, which requires in relevant part that a Michigan nonprofit health care corporation "use reasonable care to secure" members' health care records "from unauthorized access" and thereby "ensure the confidentiality of records containing personal data that may be associated with identifiable members." MCL 550.1406(1).

229.   As a nonprofit health care corporation incorporated in the State of Michigan and providing health care and hospital services in the State, McLaren Health is and was at all relevant times a "health care corporation" as that term is defined in MCL §§ 550.1105(2) and 50.1406.

230.   As a person entitled to receive health care under a nongroup insurance certificate while obtaining health care from McLaren Health, Plaintiff is and was at all relevant times a "member" as that term is defined in MCL §§ 550.1106(3) and 50.1406.

231.   By the acts alleged above, McLaren Health violated the Reform Act by failing to adequately safeguard Plaintiff's PII/PHI from unauthorized access by third party actors. Considering the sensitivity of the information McLaren Health possessed, McLaren Health was aware or should have been aware of the need to implement robust security measures to protect such information. It consciously refused to do so.

232.   Accordingly, Plaintiff and each member of the Michigan subclass are entitled to, and seek, damages "for a violation of [the Reform Act] and may recover actual damages or $200.00, whichever is greater, together with reasonable attorneys' fees and costs." § 550.1406(4).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.   For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.     For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.     For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.     For prejudgment interest on all amounts awarded; and

G.     Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

DATE: May 14, 2025              Respectfully submitted,


s/ Nicholas A. Coulson
Nicholas A. Coulson
Julia G. Prescott
**COULSON P.C.**
300 River Place Drive
Detroit, MI 48207
T: (313) 644-2685
E: nick@coulsonpc.com
   jprescott@coulsonpc.com

*Counsel for Plaintiff and the Putative Classes*