**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| JOYCE WEHRLE, YVETTE GRIFFIN, AND ALICE KLEINSCHMIDT, *on behalf of themselves and all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>McLAREN HEALTH CARE CORPORATION, and BARBARA ANN KARMANOS CANCER INSTITUTE,<br><br>*Defendants*. | Case No. 2:25-cv-11420-MFL-CI<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Joyce Wehrle, Yvette Griffin, and Alice Kleinschmidt, by and through their attorneys, for their Complaint against McLaren Health Care Corporation ("McLaren Health") and Barbara Ann Karmanos Cancer Institute ("Karmanos") (collectively, "Defendants") allege and state as follows, based on personal knowledge as to Plaintiffs' own acts, and on information and belief as to all other matters, based on the investigation conducted by Plaintiffs' counsel:

## INTRODUCTION

1. This is a class action lawsuit brought on behalf of individuals who used Defendants' websites, www.mclaren.org and www.karmanos.org (the "Websites") and whose private information Defendants disclosed to third parties, without consent, through the use of tracking software Defendants embedded in those websites.

2. Unbeknownst to patients, going back years Defendants knowingly installed and maintained third-party tracking technologies such as the Meta Pixel, Google Analytics, Google Tag Manager, and LinkedIn Insight Tag (these and any other tracking technologies which may be identified during discovery are collectively referred to as "Tracking Tools"). These Tracking Tools track and collect patients' communications with Defendants via the Websites and surreptitiously force the users' web browsers to send their communications to undisclosed third parties, such as Meta, Google and LinkedIn.

3. The users' communications are highly sensitive and essentially constitute computer-accessible records of medical interests, treatment-seeking behavior, and healthcare service inquiries. Once third parties gain access to this private information, they utilize the collected personal data to enhance their advertising technology and potentially target individuals with marketing.

4. By embedding and maintaining Tracking Tools in their Websites,

Defendants collected and disclosed Plaintiffs' and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties. All of this was done without prior written notice or informed consent, and Defendants' shared Privacy Policy and Terms of Use fail to adequately disclose these practices.

5. Defendants breached their statutory and common law obligations to Plaintiffs and Class Members by, inter alia: (i) implementing and then failing to remove or disengage technology known and designed to share web-users' information; (ii) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information; (iii) failing to take steps to block transmission of Plaintiffs' and Class Members' Private Information through Tracking Tools; (iv) failing to warn Plaintiffs and Class Members; and (v) otherwise failing to design, and monitor the Websites to maintain the confidentiality and integrity of patient Private Information.

6. As a result, Plaintiffs and Class Members suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of the Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

7. Plaintiffs seek to remedy these harms and brings causes of action for (1) breach of fiduciary duty/confidentiality; (2) violation of the Electronics

Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) – unauthorized interception, use, and disclosure; (3) intrusion upon seclusion; (4) breach of implied contract; (5) unjust enrichment; and (6) negligence,

## PARTIES

8. Plaintiff Joyce Wehrle is a natural person and citizen of Michigan where she intends to remain. At all times relevant hereto, Joyce Wehrle has been a patient of McLaren Health.

9. Plaintiff Yvette Griffin is a natural person and citizen of Michigan where she intends to remain. At all times relevant hereto, Yvette Griffin has been a patient of McLaren Health.

10. Plaintiff Alice Kleinschmidt is a natural person and citizen of Michigan where she intends to remain. At all times relevant hereto, Alice Kleinschmidt has been a patient of McLaren Health and Karmanos.

11. Defendant McLaren Health Care Corporation is a domestic nonprofit corporation incorporated in Michigan with its principal place of business located at 1 McLaren Parkway, Grand Blanc, Michigan 48439. McLaren has approximately 20,000 employees across its facilities and generated approximately $6.6 billion in revenue in 2023.

12. McLaren Health serves a growing number of customers across Michigan (and a lesser number in bordering states), including through 12 hospitals,

ambulatory surgery centers, imaging centers, a 640-member employed primary and specialty care physician network, commercial and Medicaid HMOs, home health, infusion and hospice providers, pharmacy services, a clinical laboratory network, and a wholly owned medical malpractice insurance company.[1]

13. Karmanos is the largest provider of cancer care and research in Michigan and is wholly owned by McLaren Health. Karmanos is a domestic nonprofit corporation incorporated in Michigan and headquartered at 4100 John R Street, Detroit, Michigan 48201. Karmanos has approximately 1,000 employees across 17 facilities, and an annual revenue of more than $20 million in 2023.

14. Defendants are covered entities under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION & VENUE

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are

[1] About McLaren Health Care, https://www.mclaren.org/main/about-mclaren-health-care (last visited September 3, 2025).

more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants.

16. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges one or more question(s) of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

17. This Court has personal jurisdiction over Defendants because their principal places of business are in this District, both Defendants conduct substantial business throughout the State of Michigan and in this District, and many of the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

18. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendants' principal places of business is in this District and both defendants regularly conduct business in this District, including operating healthcare facilities where patients' personal and health information is collected and processed through the Website systems at issue in this lawsuit.

## COMMON FACTUAL ALLEGATIONS

### A. *Federal Regulators and State Law Make Clear that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal*

19. The surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue.

20. Defendants are health care entities and thus their disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services ("HHS") promulgated "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Privacy Rule, no health care provider can disclose a person's protected health information to a third party without express written authorization.

21. In recent years, both the Federal Trade Commission ("FTC") and the HHS Office for Civil Rights have reiterated the importance of and necessity for data security and privacy concerning health information.

22. For instance, the FTC has engaged in numerous enforcement actions against companies operating health-related apps or websites.[2]

[2] *See, e.g.*, *United States v. Easy Healthcare Corp.*, No. 1:23-cv-3107 (N.D. Ill. May 17, 2023); *In the Matter of BetterHelp, Inc.*, No. C-4796 (FTC Mar. 2, 2023); *United States v. GoodRx Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 1, 2023); *In the Matter of Flo Health, Inc.*, No. C-4747 (FTC June 17, 2021); *see also* Jill McKeon, *How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, Health IT Security (May 2, 2023), https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy.

23. In 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google and Criteo.[3]

24. Another FTC enforcement action against online counseling service BetterHelp resolved in a $7.8 million settlement based on allegations that the company shared customer health data with Facebook and Snapchat.[4]

25. Meanwhile, the FTC submitted a stipulated order requiring Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[5]

---

[3] *United States v. GoodRx Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 17, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale.").

[4] *In the Matter of BetterHelp, Inc.*, No. C-4796 (FTC July 7, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, FTC (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising.

[5] *United States v. Easy Healthcare Corp.*, No. 1:23-cv-3107 (N.D. Ill. June 22,

26. In July 2023, federal regulators sent a letter to 129 health care providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned that "[i]mpermissible disclosures of an individual's personal health information to third parties" could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[6]

27. Federal regulators also warned that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of

---

2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, FTC (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc.

[6] Letter from Melaine Fontes Rainer, Director, Office for Civil Rights, U.S. Dept. of Health and Human Servs. & Samuel Levine, Director, Bureau of Consumer Protection, Federal Trade Comm., to 129 health care providers (July 20, 2023), https://www.hhs.gov/sites/default/files/ocr-ftc-letters-re-use-online-tracking-technologies.pdf.

personal health information under the FTC Act and the FTC Health Breach Notification Rule."[7]

28. Moreover, the HHS Office for Civil Rights has made clear, in a bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the transmission of protected health information violates the Privacy Rule:

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[8]

29. The Bulletin points out the harms that impermissible disclosure of an individual's PHI may cause patients, such as:

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information

[7] *Id.*

[8] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (footnotes omitted) (vacated in part by *American Hosp. Ass'n. v. Becerra*, No. 4:23-cv-01110-P, ECF No. 67 (S.D. Tex., Jun. 20, 2024), only to the extent that HIPAA obligations are triggered where online technology connects an IP address with an unauthenticated webpage addressing specific health conditions or healthcare providers).

> about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[9]

30. State law likewise prohibits the disclosure of patients' Private Information.

31. The Michigan Nonprofit Health Care Corporation Reform Act, MCL 550.1406, requires health care entities to provide reasonable care in securing their members' health care records from unauthorized access and to collect only personal data that is necessary for payment of claims, treatment and research. It further prohibits health care entities from disclosing any records containing personal data of any member without written notice and written consent of that member.

32. Additionally, the Michigan Public Health Code states that a "patient or resident is entitled to confidential treatment of personal and medical records, and may refuse their release to a person outside the health facility or agency except as required because of a transfer to another health care facility, as required by law or third party payment contract, or as permitted or required under the health insurance portability and accountability act of 1996, Public Law 104-191, or regulations promulgated under that act, 45 CFR parts 160 and 164." MCL 333.20201(2)(c).

---

[9] *Id.*

### B. *Industry Standards Dictate that Protecting Patient Data and Communications is the Duty of Health Care Companies*

33. A medical provider's duty of confidentiality is a cardinal rule embedded in the physician-patient and hospital-patient relationship.

34. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

35. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

36. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

37. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must… release patient information only in keeping ethics guidelines for confidentiality.

**C. *Visitors to Defendants' Websites Reasonably Expect their Information to Stay Private***

38. McLaren and Karmanos operate interconnected Websites that serve as extensions of their healthcare services. Both Websites share the same Terms of Service and Privacy Policy, with the policies on both Websites referring only to McLaren and not mentioning or specifying Karmanos. This shared structure creates an integrated online presence for both healthcare entities.

39. Like most healthcare providers of their size, Defendants operate their Websites to facilitate patient care and information. Both Websites allow users to search for physicians by name, specialty, location, and other criteria; schedule or request appointments; pay for medical services; obtain information about conditions and treatments; inquire about clinical trials and research; and search for various medical institutions and services.

40. When using these online services, users input their medical information, including private and confidential information regarding medical

conditions and treatment, with the reasonable expectation that such information will be kept confidential and used only for legitimate healthcare purposes.

41. Users of the Websites reasonably expect that their communications and activities will remain private, particularly given McLaren's and Karmanos's status as healthcare providers subject to HIPAA and other privacy regulations, as well as professional and ethical obligations to protect patient confidentiality.

42. This expectation of privacy is further reinforced by statements in the shared Privacy Policy, suggesting that McLaren and Karmanos maintain appropriate protections for patient information. However, as detailed in this Complaint, these representations are contradicted by Defendants' actual data collection and disclosure practices.

43. Users would not reasonably expect that simply by visiting McLaren's or Karmanos's Websites to search for doctors, research medical conditions, or explore treatment options, their sensitive health information would be disclosed to third parties like Meta, Google, and LinkedIn for purposes wholly unrelated to healthcare.

**D. *Overview of Website Tracking on HealthCare Websites***

44. In today's digital world, many websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become increasingly sophisticated, evolving from simple cookies to complex

systems that can monitor detailed user behavior across websites and devices.

45. Website tracking technologies typically function by placing small pieces of code on websites that are downloaded to a user's browser when they visit the site. This code enables the collection of various types of data about the user's interactions with the website, which is then transmitted to third-party servers for processing and storage.

46. The most basic form of website tracking involves cookies, which are small text files stored on a user's device that contain information about their browsing activity.

47. First-party cookies are placed by the website the user is visiting directly, while third-party cookies are placed by domains other than the one the user is visiting. These third-party cookies enable tracking across multiple websites and are commonly used for advertising and analytics purposes.

48. JavaScript-based trackers are more sophisticated. Website owners implement these trackers by embedding JavaScript code snippets into their website's hidden source code. When a user loads a webpage containing the JavaScript code, the tracker is downloaded onto the user's browser, where it activates and collects data about user behavior, which is then transmitted to the tracker provider's servers in real-time.

49. The collection and disclosure of healthcare-related information through

these JavaScript type trackers is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

50. To understand Defendants' unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

51. Devices (such as computer, tablet, or smart phone) access web content through a web browser (e.g., Google's Chrome, Mozilla's Firefox, Apple's Safari, and Microsoft's Edge).

52. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' devices. These communications are facilitated by web browsers.

53. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses and their corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.
- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. "GET Requests" are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can store information on the client device that can later be communicated to a server. Cookies are sent from client devices to the host server along with HTTP Requests. Some cookies are "third-party cookies," which means they can store data from one website and communicate it to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[10]

54. On a website, a user's HTTP Request essentially asks the website to retrieve certain information. The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on users' screens as they navigate a website.

55. As an example, a patient's HTTP Request seeks specific information from the Defendants' Websites (e.g., "Find a Physician" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

56. When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels.

[10] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

57. Tracking pixels (like the Meta Pixel discussed below) are tiny image files that are so small as to be invisible to website users. They are purposefully designed and camouflaged so that website users remain unaware of them.

58. Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

59. Source Code may also quietly command a web browser to send data transmissions to third parties in the form of HTTP Requests executed in the background, without notifying the web browser's user.

60. As the example below illustrates, when a patient visits https://www.mclaren.org and selects the "Find A Physician" button, the user only sees the Markup returned by the HTTP Response, not Defendant's Source Code, the underlying HTTP Requests and Responses, or the tracking pixel.




61. Behind the scenes and in the backdoor of the Website, however, Tracking Tools like the Meta Pixel, Google Analytics, and the LinkedIn Insight Tag are embedded in the Source Code, automatically transmitting what the patient does on the webpage and effectively opening a hidden spying window into the patient's browser.

62. Defendants' implementation of the Tracking Tools is Source Code that does just that. The Tracking Tools act much like a traditional wiretap. When patients visit Defendants' Websites via an HTTP Request to McLaren Health Care Corporation's server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user, *along with* Source Code that includes the Tracking Tools. Thus, Defendants are in essence handing patients a tapped phone,

and once the webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the Websites to trigger the tap, which intercepts those communications intended only for Defendants and transmits them to third parties.

**E. *Defendants Installed Tracking Tools On their Websites to Collect Users' Private Information and Disclose it to Third Parties***

63. Third parties, like Meta, Google, and LinkedIn, offer Tracking Tools as free software that companies can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

64. In general, Tracking Tools are automatically configured to capture "Standard Events" like a user's visit to a particular webpage, that webpage's URL and metadata, button clicks, etc. Companies, such as Defendants, can track other user actions and communications and can create their own tracking parameters by customizing the software on their websites.

65. When a user accesses a webpage with embedded Tracking Tools, their communications with the webpage are instantaneously and surreptitiously duplicated and sent to the third party.

66. Third parties, like Meta, Google, and LinkedIn, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the person associated with the Private Information intercepted.

67. Then, completely unencumbered by any pretense of restriction or regulation, the third parties in turn, use that Private Information for various business purposes, including using such information to "improve" advertisers' ability to target specific demographics and selling such information to third-party marketers who target those users online (through their Facebook, Instagram, Gmail and other social media and personal accounts).

68. Along with encouraging businesses to spend ad dollars, Meta, Google and LinkedIn also receive the transmitted data, and can use it to hone their algorithms. Facebook can also use data from the pixel to link website visitors to their Facebook accounts, meaning businesses can reach the exact people who visited their sites. The pixel collects data regardless of whether the visitor has an account.

69. The third parties to whom Defendants' Websites transmit data through Tracking Tools do not provide any substantive Website content relating to the patient's use of the Websites. Instead, they are typically procured to track user data and communications for marketing purposes of the website owner (i.e., to bolster

profits).

70. Thus, without any knowledge, authorization, or action by a user, website owners like Defendants can use their source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

**F. *The Meta Pixel Tracking Technology***

71. Meta is a tech company that owns various social media mobile apps including Facebook, the largest social networking site on the planet, touting 2.9 billion monthly active users. Facebook describes itself as a "real identity platform,"[11] meaning users are allowed only one account and must share "the name they use in everyday life."[12] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

72. Facebook generates revenue by selling advertising on its platform and highlights its ability to target users. Facebook's targeting is so effective because it surveils user activity both on and off its site. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their interests,

---

[11] *Sam Schechner and Jeff Horwitz, How Many Users Does Facebook Have? The Company Struggles to Figure It Out,* WALL. ST. J. (Oct. 21, 2021).
[12] Meta, *Names allowed on Facebook*, https://www.facebook.com/help/229715077154790 (last visited September 8, 2025).

behavior, and connections. Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[13]

73. Advertisers can also build "Custom Audiences."[14] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website." Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[15]

74. Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.

---

[13] Meta, *Easier, More Effective Ways to Reach the Right People on Facebook*, https://www.facebook.com/business/news/Core-Audiences (last visited September 8, 2025).

[14] Meta, *About Custom Audiences,* https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited September 8, 2025).

[15] Meta, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited September 8, 2025).

One such Business Tool is the Meta Pixel, estimated to be installed on 5.8 million websites.[16]

75. The Meta Pixel is an *invisible* snippet of code that websites owners (like Defendants) chose to embed on their sites to facilitate tracking of user interactions, including page views, button clicks, form submissions, and other browser events.[17] Websites and apps use the Meta Pixel and its software development kit (SDK) to collect information about user's devices and activities, and send that to Facebook. Facebook then uses that information to show the user targeted ads.

76. To obtain the code for the Meta Pixel, the website owner tells Facebook which website events it wants to track and Facebook returns corresponding Facebook pixel code for the website owner to incorporate.

77. Once activated, the Meta Pixel "tracks the people and type of actions they take."[18] When the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes, analyzes, and assimilates it into datasets like the Core Audiences and Custom Audiences.

78. Website owners control what actions—or, as Facebook calls it,

---

[16] *GoodRx*, *supra* note 2.
[17] Meta, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited September 8, 2025).
[18] Meta, *Retargeting*, https://www.facebook.com/business/goals/retargeting (last visited September 8, 2025).

"events"—the Meta Pixel will collect, including the website's or app's metadata, along with what pages a visitor views and what buttons a visitor clicks. Website owners can also configure the Meta Pixel to track other events. Facebook offers a menu of "standard events" including what content a visitor views or purchases. Website owners can also create their own tracking parameters by building a "custom event."

79. Thus, website owners, like Defendants here, control how the Meta Pixel identifies visitors. The Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[20] Pixel-specific data includes "the Pixel ID and Facebook cookie."[21]

80. When a user visits a website containing the Meta Pixel, the Pixel causes the user's browser to make a request to Meta's external servers to then send back instructions to the individual's browser. These instructions include requests that the user's browser transmit data from the user's device to Meta. This data is generated while the user navigates and interacts with the website and can include webpage

---

[19] Meta, *Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/ (last visited September 8, 2025).
[20] *Id.*
[21] *Id.*

URLs, search requests, events on the websites (e.g., button clicks), and form-field information inputted by the user.

81. The Meta Pixel associates users' online activity with their Meta accounts through Facebook and Instagram. When a user is logged into Facebook, the Pixel can match the user's off-site activity with their profile on Meta's platforms, thereby creating detailed behavioral profiles used for ad targeting, content customization, and algorithmic inference. As Meta explains, the Meta Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts" and "the Pixel will track URLs visited, domains visited, and the devices your visitors use."[22]

82. Meta connects user data from Defendants' Websites to the individual's Facebook ID ("FID"), assigned to each person who has a Facebook account. The FID is comprised of a unique and persistent set of numbers that can be easily used to look up that person's Facebook account by simply typing the numbers after www.facebook.com/ and hitting "Enter."

83. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and

[22] Meta, *Get Started – Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited September 8, 2025).

other details. Because the user's FID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the FID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

84. Meta tracks and collects data even on people who do not have a Facebook account or have deactivated their Facebook accounts. Those individuals can find themselves in an even worse situation because even though their Private Information is sent to Meta—without their consent—they cannot clear past activity or disconnect the collection of future activity since they do not possess an account (or an active account).[23]

85. When a user visits a website with an embedded Meta Pixel, the Meta Pixel will download a series of cookies onto the user's device with unique identifiers that allow Meta to track that user.

86. The Meta Pixel uses both first and third-party cookies. The cookies that Meta causes to be downloaded on users' devices include the "c_user," "datr," "fr,"' and "_fbp" cookies. These are different types of cookies that perform different functions for Meta.

[23] In the past, these were referenced as "ghost accounts" or "shadow profiles." *See* Laura Hautula, *Shadow profiles: Facebook has information you didn't hand over*, CNET (April 11, 2018), https://www.cnet.com/news/privacy/shadow-profiles-facebook-has-information-you-didnt-hand-over/.

87. The c_user cookie contains a unique identifier linked to an individual's Facebook account that necessarily reveals a consumer's Meta social media profile. For example, appending the c_user value to the Facebook URL reveals the consumer's Facebook profile. If the c_user value is 123456, the corresponding user profile can be accessed at www.facebook.com/123456. This cookie enables Facebook to uniquely identify a user and associate their activity on external websites with their Facebook profile.

88. The fr cookie is a browser-based tracking tool used by Meta to support personalized advertising and collect usage analytics. It includes the unique FID that allows Meta to monitor user activity across multiple sites and devices, building insights into user behaviors and interests. Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.

89. In contrast to the c_user cookie tied specifically to authenticated Facebook users, the fr cookie can be used to track both Facebook account holders and non-users. This means Meta can gather data on individuals even if they are not actively logged into or registered on Facebook.

90. The datr and _fbp cookies are both used by Meta to identify users'

browsers and related data.[24]

91. Defendants also revealed their Websites visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user.

92. Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendants.

93. In summary, Meta, at a minimum, uses the fr, _fbp, and c_user cookies to link website visitors' communications and online activity with their Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Meta even when they have disabled third-party cookies within their web browsers.

94. These cookies are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.

---

[24] Facebook, *Cookies Policy*, https://www.facebook.com/privacy/policies/cookies?annotations[0]=explanation%2F1_common_cookies_and_uses (last visited September 8, 2025).

95. Although Facebook created these cookies, Defendants are responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendants' implementation and use of the Pixel throughout their websites.

96. Defendants programmed their Websites to include the Meta Pixel which, in combination with the cookies listed above, enabled Meta to intercept users' communications. In doing so, Defendants' Websites sent to Facebook certain information about the user, their communications, URL's visited, and, most notably, the viewers' FID.

**G. *Meta CAPI Workaround Tracking Technology***

97. In addition to Meta Pixel, upon information and belief, Defendants also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on their servers.[25] CAPI is designed to create a direct connection between a website host's marketing data and Meta.

98. Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Meta, CAPI does not cause the user's browser

---

[25] Samir ElKamouny, *How To Implement Facebook Conversions API (in Shopify)*, Fetch&Funnel,https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited September 8, 2025) ("Conversions API works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns.").

to transmit information directly to Meta. Instead, CAPI tracks the user's website interaction (including Private Information), records and stores that information on the website owner's servers (Defendants here), and then transmits the data to Meta from the website owner's servers.[26]

99. Further, because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendants to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Meta directly.

100. Thus, the communications between patients and Defendants, which are necessary to use Defendants' Websites, are received by Defendants and stored on their server(s) before CAPI collects and sends the Private Information contained in those communications directly from Defendants to Meta. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

---

[26] *See* Meta, *Conversions API*, https://developers.facebook.com/docs/marketing-api/conversions-api/ (last visited September 8, 2025) ("Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel. . . . This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.").

101. In the absence of discovery and without access to Defendants' servers, there is no way for Plaintiffs to confirm with certainty that Defendants implemented workarounds like CAPI. However, Meta instructs companies to "[u]se the Conversions API in addition to the Meta Pixel, and . . . share the same events using both tools." Such a "redundant event setup" allows Defendants "to share website events [with Meta] that the Pixel may lose" otherwise.[27] Thus, it is reasonable to infer that Meta's customers implementing the Meta Pixel in accordance with Meta documentation will also implement the CAPI workaround.

102. The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive website content relating to the user's communications. Instead, these third parties are typically used to track user data and communications for marketing purposes of the website owner (i.e., to bolster profits).

103. Thus, without any knowledge, authorization, or action by a user, website owners like Defendants use their source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the user's communications to third parties.

---

[27] Meta, *Best Practices – Conversations API*, Facebook, https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/ (last visited September 8, 2025).

**H.** ***The Google Analytics Tracking Technology***

104. Google LLC ("Google") is a multinational technology company operating one of the world's largest online platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, including Google Search, Gmail, YouTube, and Android, which it then leverages to deliver targeted ads.

105. Google Analytics is a web analytics service offered by Google that allows website owners to track visitors' actions on their website in order to gain insights into user behavior and for ad targeting. McLaren and Karmanos both implemented Google Analytics on their Websites.

106. Though the Google Analytics tracking tool is marginally different than the Meta Pixel, it essentially accomplishes the same goal: tracking user communications with Defendants' websites.[28]

107. Google Analytics is a JavaScript-based tracking technology. Website owners implement Google Analytics by adding a snippet of JavaScript code to their

[28] *Comparing Google Analytics vs Facebook Pixel*, Boltic, https://www.boltic.io/blog/google-analytics-vs-facebook-pixel (last visited September 8, 2025) ("Google Analytics and Facebook Pixel are both excellent tools for measuring website performance and user behavior.").

website, typically in the header section of the site's code. This process is usually simple, requiring the website administrator to copy and paste the provided code into the website's source code.

108. Once implemented, Google Analytics loads automatically and immediately whenever a user visits a page containing the tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms. The surreptitious nature of these trackers means that users typically have no idea that their personal data is being collected, recorded, and disclosed to third parties like Google.

109. Google Analytics collects various data points about user interactions, which it calls "events" and transmits these details to Google. These events include page views, clicks, form submissions, video plays, file downloads, and custom events defined by the website owner.

110. When users access a website such as those belonging to McLaren or Karmanos while logged into a Google Chrome Browser or logged into their Google Account (such as by logging into their Gmail or YouTube account), Google creates and assigns unique identifiers to website visitors, thereby allowing individual

patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[29]

111. Google assigns unique identifiers through the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies (collectively, the "Google Cookies"). Each of the Google Cookies contain a string of numbers and letters which is unique to each user's Google account, and will be the same on any device or browser that the Google Account holder is logged in to. Google uses these Google Cookies to build a profile of website visitor interests to show relevant and personalized ads through retargeting. The identifiers associated with the Google Cookies remain constant for approximately 2 years, unless a user manually "clears" their cookies (upon which Google will automatically generate a new, unique identifier associated with each of the cookies.)

112. The Google Cookies allow data sent to Google through Google Analytics 4 to be linked to the user's Google account, making it personally identifiable because to create a Google Account, a user is required to tell Google their email address. The NID cookie is used to show Google ads in Google services

[29] *See Brown v. Google LLC*, No. 4:20-cv-3664-YGR, 2023 WL 5029899, at n.11 (Aug. 7, 2023) (quoting Google employee deposition testimony explaining how Google tracks user data).

for users who are signed out of their Google Accounts. It contains a string of numbers and letters unique to each user's browser. The identifier associated with the NID cookie remains constant for approximately 6 months, unless a user manually "clears" their cookies (upon which Google will automatically generate a new, unique identifier associated with the NID cookie).

113. Once Google receives, views, reads, and processes the raw user data about "events," which may include personal and sensitive health-related information, it uses the cookies to associate this data with unique user identifiers, from which it can link website interactions to individual user profiles and track users across multiple different Websites, sessions, and devices when signed into their Google accounts. After the data has been processed and subsequently stored in the Google database, Google uses the data to generate reports to analyze the data collected. Those reports include reports on acquisition (e.g., information about where the traffic originated and the methods by which users arrived at a site), engagement (what web pages and app screens a user visited), and demographics (a user's age, location, language, gender, and interests expressed when browsing online and engaging in purchase activities).

114. In addition to accessing and using the data collected from website users, Google also uses the information shared by sites like McLaren and Karmanos to maintain and improve Google's own services, develop new services, measure the

effectiveness of its advertising, and personalize content and ads that one sees on Google's and its partners' sites and applications. When combined with Google's vast data resources from its other products and services, Google Analytics data can contribute to comprehensive profiles of individuals that can be used for targeting advertisements and other commercial purposes.

### I. *The LinkedIn Insight Tag Tracking Technology*

115. LinkedIn Corporation ("LinkedIn") is a professional social networking platform owned by Microsoft Corporation. LinkedIn maintains detailed profiles of over one billion registered users worldwide, including their names, professional histories, skills, connections, and engagement patterns across the platform. It generates substantial revenue through premium subscriptions, recruitment services, and advertising solutions.

116. LinkedIn's advertising business depends on its ability to target users based on their professional attributes and online behaviors. To enhance this capability beyond its own platform, LinkedIn offers tracking tools such as the LinkedIn Insight Tag enabling businesses to monitor user interactions on their websites and subsequently target those users with advertising on the LinkedIn platform.

117. The LinkedIn Insight Tag is a piece of JavaScript code that website owners integrate into their websites. It collects various types of user data including

IP addresses, browser information, device data, page views, and detailed user interactions. This data allows LinkedIn to build comprehensive profiles that link users' professional identities with their browsing behaviors across the internet, including their healthcare-related activities.

118. Defendants implemented the LinkedIn Insight Tag on the Karmanos Website, enabling LinkedIn to collect sensitive cancer treatment and healthcare information from patients and Website visitors.

119. The LinkedIn Insight Tag collects various types of user data including, but not limited to, IP addresses, browser information, device data, page views, and user interactions on a Website.

120. LinkedIn's collection of users' addresses collection is particularly significant in this context. An IP address is a globally unique numerical identifier that guides or routes communications across the internet. Often written as four sets of numbers separated by periods (e.g., 192.555.455.145), Internet Service Providers assign IP addresses to networking devices such as modems or routers (including household modems and routers).

121. IP addresses function as the essential addressing system of the internet. Just as a telephone number is a unique number necessary to route a phone call to the correct household, an IP address is a unique number necessary for routing internet communications to the correct location.

122. IP addresses reveal significant information about website visitors. Just as a phone number can reveal the general location of the caller, an IP address reveals the geographic location of the internet user. For example, free online "IP lookup" services use databases that map IP addresses to geographic areas—often providing information about the country, city, county, approximate latitude and longitude coordinates, or even the internet service provider associated with the IP addresses.

123. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking purposes. IP addresses can allow companies to target advertisements to users in specific geographic areas with 95% accuracy.

124. Moreover, IP addresses allow businesses to track user interactions and behaviors across multiple websites, building detailed profiles of users' browsing habits and preferences tied to their location. They are particularly powerful for identifying and tracking specific individuals. When individuals use their devices across different locations (such as home, work, coffee shops, or other locations), each location will have its own IP address. By tracking these patterns of movement between different IP addresses, companies can build detailed profiles of individual users' daily routines and behaviors.

125. For these reasons, Europe's General Data Protection Regulation regards IP addresses as "personal data, as they can potentially be used to identify an

individual." Similarly, under HIPAA, IP addresses are considered personally identifiable data (45 C.F.R. § 164.514(b)(2)(i)(O)).

126. The LinkedIn Insight Tag also creates and uses several cookies to track users. One key cookie is the "bcookie," which is a "browser identifier cookie to uniquely identify devices accessing LinkedIn," whether the user is a LinkedIn member or not. This cookie functions as a persistent identifier allowing LinkedIn to recognize returning visitors to the Karmanos Website. For users who are not logged into LinkedIn, the bcookie in combination with IP address tracking allows LinkedIn to persistently identify and track individual devices across multiple websites and browsing sessions, creating detailed behavioral profiles based on location and browsing habits, both on the Websites and across the internet from other websites that have implemented the LinkedIn Insight Tag.

127. For users who are logged into LinkedIn on the browser which they use to access a website, the tracking is even more extensive. When a logged-in LinkedIn user visits the Karmanos Website, the HTTP requests sent to LinkedIn contain additional cookies such as "lms_ads" and "lms_analytics." Each of these cookies is used by LinkedIn "to identify LinkedIn Members of LinkedIn" for analytics or advertising purposes. These cookies allow LinkedIn to connect the health-related information collected from the Karmanos Website directly to the user's LinkedIn profile. Since LinkedIn accounts typically contain a user's real name, professional

information, and other personal details, this creates a direct link between sensitive health information and an identified individual. This means that information about a user's cancer treatment searches, oncologist selections, or interest in specific medical procedures can potentially be associated with their professional identity on LinkedIn.

128. Once LinkedIn receives this data, it can use it to enhance user profiles, improve ad targeting, and provide analytics services back to Defendants. This means that a user's interactions with cancer treatment information, specialist searches, or appointment scheduling on the Karmanos Website can potentially be integrated into their LinkedIn profile data and used for advertising purposes.

129. The implementation of the LinkedIn Insight Tag on a cancer treatment center's Website raises particular privacy concerns, as it involves the collection and disclosure of especially sensitive health information - information related to cancer diagnosis, treatment options, and physician selections - to a social media and professional networking platform without users' explicit consent.

**J. *McLaren's Responsibility for Karmanos's Website Violations***

130. Although McLaren and Karmanos maintain separate corporate identities, McLaren is the sole member of Karmanos and exercises substantial control over its operations, including the design and administration of their shared online presence. McLaren and Karmanos jointly operate interconnected websites

governed by the same Terms of Service and Privacy Policy—documents that refer only to McLaren and contain no mention of Karmanos. McLaren therefore controls the privacy framework governing both platforms and is directly responsible for the practices described herein.

### K. *Defendants Chose to Use Trackers and Disclose Plaintiffs' and Class Members' Private Information*

131. Despite warnings from regulators, state law, and professional ethics, Defendants embedded hidden Tracking Tools, including the Meta Pixel and Conversions API, as well as the Google Analytics tool and LinkedIn Insight Tag, to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Meta, Google, and LinkedIn, essentially planting a bug on patients' web browsers that forced them disclose private and confidential communications to third parties.

132. Defendants deliberately implemented the Tracking Tools on their Websites that collect and disclose sensitive health information of their patients and Website visitors without disclosure or proper consent.

133. Defendants utilized data from the Tracking Tools for marketing purposes to bolster their revenues. Tracking Tools and workarounds like CAPI are routinely used to target specific customers by using data and information from users' communications to build profiles for the purposes of retargeting and future

marketing. Meta, Google, and LinkedIn also used Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendants.

134. The third parties, in turn, sell Plaintiffs' and Class Members' Private Information to others who geotarget Plaintiffs' and Class Members' Facebook pages based on communications obtained via the Tracking Tools.

135. Because of these Tracking Tools, Defendants' Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendants and to send those communications to Meta, Google, and LinkedIn. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

136. Neither Plaintiffs nor any other Class Member signed any written authorization permitting Defendants to send their Private Information to Meta, Google, or LinkedIn.

137. Thus, without their patients' consent, Defendants has effectively used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Meta, Google, and LinkedIn to listen in on all of their communications with Defendants and thereby intercept those communications, including Private Information.

138. The Tracking Tools allow Defendants to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendants' Websites do not rely on the Tracking Tools in order to function.

139. While seeking and using Defendants' services as medical providers, Plaintiffs and Class Members communicated their Private Information to Defendants via their Websites.

140. On information and belief, Defendants' Tracking Tools necessarily sent non-public Private Information to third parties like Meta, Google, and LinkedIn, including but not limited to Plaintiffs' and Class Members': (1) health conditions; (2) desired medical treatment or therapies; (3) desired locations or facilities where treatment was sought; (4) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); (5) searched and selected physicians and their specialties conducted via the Website search bars; and (6) appointment scheduling activities.

141. McLaren implemented at least the Meta Pixel and Google Analytics across its Website, including on pages where users search for medical specialists, research health conditions, locate treatment facilities, and schedule appointments.

142. Karmanos implemented at least the Google Analytics and the LinkedIn Insight Tag across its Website, including on pages related to cancer treatments, physician searches, clinical trials, and diagnostic services.

143. These Tracking Tools operate invisibly to Website visitors, who have no meaningful way of knowing that their sensitive health queries and browsing behaviors are being collected and disclosed.

144. The information captured through these Trackers and disclosed to third parties creates automated, computer-accessible records of members' medical interests, care-seeking behavior, and treatment preferences and when combined with persistent identifiers (cookies and FID for Meta, cookies for Google Analytics and both cookies and IP addresses for LinkedIn Insight Tag), this information allows third parties to identify individual users and associate sensitive health information with their digital profiles.

145. The persistent identifiers used by these Tracking Tools create digital fingerprints that allow third parties to track individuals across multiple devices and browsing sessions, connecting their healthcare inquiries to broader online activities.

146. As demonstrated in the following examples, McLaren and Karmanos enable the collection and disclosure of sensitive Private Information.

*Specific Examples of Personal Data Collection and Disclosure on the McLaren Website*

147. *Physician Searches and Selection:* When a patient uses the McLaren Website to search for a doctor or specialist by clicking the "Find A Physician" button located at the top of the Website's homepage, they can search for doctors and specialists or filter their search results by specialty (e.g., gynecologic oncology), gender, hospital affiliation, zip code, or keyword. From the results displayed, the patient can select a specific provider to view their profile.

148. Unbeknownst to patients, their search criteria and physician selections are automatically collected and disclosed to third parties via the Tracking Tools. For example, if a patient searches for and selects gynecologic oncology specialist Dr. Radhika Gogoi, this personal data is collected and disclosed.

149. *Doctor Communication:* Many doctors and specialists on the McLaren Website have their phone numbers listed on their profiles, enabling patients to initiate calls to schedule appointments or discuss medical needs. If a patient clicks on a doctor’s phone number to initiate a call, this action, the doctor's phone number, and the doctor’s identity are captured via the Tracking Tools and disclosed to third parties, along with any search criteria entered before reaching the doctor's profile.

150. *Location Searches:* When a patient uses the McLaren Website to find a treatment location by clicking the "Hospitals & Locations" button, they can search for healthcare centers by specifying services, hospital affiliation, keywords, or zip

codes. For example, if a patient searches for "Breast Center" and "Obstetrics and Gynecology" facilities in Port Huron, all this information is collected and disclosed.

151. *Medical Condition and Treatment Searches:* When a patient uses the McLaren Website to search for information about specific medical conditions or treatments using either the "Services" option or the general search bar, these searches are collected and disclosed via the Tracking Tools. For instance, when a patient searched for information about "Hemorrhoid" treatment or searched for "Miscarriage," these exact search terms are collected and disclosed.

*Specific Examples of Personal Data Collection and Disclosure on the Karmanos Website*

152. *Specialist Searches:* When a patient uses the Karmanos Website to search for cancer specialists by clicking the "Find a Specialist" button, they can choose to search based on filters including name, ZIP code, search radius, physician gender, cancer type, and hospital affiliation. For example, if a patient searches for and views the profile of Dr. Suresh Balasubramanian, a hematology oncology specialist, this information is collected and disclosed via the Tracking Tools.

153. *Specialty Department Exploration:* When a patient clicks on links within a doctor's profile to learn more about specific departments or specialties, this information is also tracked. For instance, if a patient clicks on the "Hematology

Oncology" link within Dr. Balasubramanian's profile, this information is collected and disclosed.

154. *Doctor Communication*: Many doctors and specialists on the Karmanos Website have their phone numbers listed on their profiles, enabling patients to initiate calls to schedule appointments or discuss medical needs. If a patient clicks on a doctor's phone number to initiate a call, this action, the doctor's phone number, and the doctor's identity is collected and disclosed.

155. *Location Searches:* When a patient uses the Karmanos Website to find a cancer treatment location by clicking the "Find a Locations" button, they can search for healthcare centers by specifying services, zip codes and radius by miles. For example, if a patient searches for "Mammography" and the zip code "49735," all this information is collected and disclosed to third parties.

156. *Treatment Information Searches:* When a patient researches specific cancer treatments on the Karmanos Website by clicking on "Diagnostics & Treatments," and then entering search terms or clicking on the "Featured Diagnostics and Treatments" displayed, their searches and subsequent page views are collected and disclosed. For instance, when a patient searched for radiation treatment and clicked on links to learn more about radiation therapy, these actions are collected and disclosed.

157. *Cancer Screening Information:* When a patient uses the search function on the Karmanos Website to find information about cancer screenings, these searches are tracked and disclosed. For example, when a patient searched for "cervical cancer screening" and clicked on related links, this sensitive health information was collected and disclosed to both Google and LinkedIn.

158. In each of these examples above (relating to both the McLaren and Karmanos Websites), the disclosed information reveals sensitive personal data about the patient's potential medical concerns, specific doctors they are interested in seeing, treatments they are researching, or healthcare facilities they wish to visit. All of this personal data is disclosed along with persistent identifiers that can be used to identify individual patients.

159. Information sent to Meta was sent alongside the Plaintiffs' and Class Members' Facebook ID (c_user cookie or "FID"), allowing individual patients' communications with Defendants—and the Private Information contained in those communications—to be linked to their unique Facebook accounts and therefore their identity.

160. Similarly, the information was sent to Google Analytics through cookies and both cookies and IP addresses for LinkedIn Insight Tag) that can be used to identify individual patients.

161. As such, the Tracking Tools Defendants installed on their Websites disseminated Plaintiffs' and Class Members' private health information to third parties.

162. At present, the full breadth of Defendants' tracking and data sharing practices is unclear, and evidence adduced in discovery may show that Defendants have been using additional Tracking Tools to transmit its patients' Private Information to other third parties.

163. Defendants did not disclose that these or any other Tracking Tools embedded in their Websites source code track, record, and transmit Plaintiffs' and Class Members' *Private Information* to anyone. Moreover, Defendants never received consent or written authorization to disclose Plaintiffs' and Class Members' private communications to anyone.

**L. *Plaintiff-Specific Allegations***

164. Plaintiff Wehrle has been a patient of Defendant McLaren and has regularly used McLaren's Website since at least 2022 During the relevant time period, when the Tracking Tools were present, Plaintiff Wehrle used Defendant McLaren's Website to, without limitation, book her regular mammogram appointments.

165. Plaintiff Wehrle has maintained an active Facebook account throughout the relevant period in this case, which she is perpetually logged into and which is registered under her legal name.

166. Plaintiff Griffin has been a patient of Defendant McLaren for over twelve years and has used McLaren's Website multiple times during that period. She generally accessed the Website on her Android mobile device and also at times using the Google Chrome browser on her laptop. During the relevant time period, when the Tracking Tools were present, Plaintiff Griffin used Defendant McLaren's Website to search for provider locations, doctors and medical professionals, to search for information on treatments, and to receive health information.

167. Plaintiff Griffin has maintained an active Facebook account throughout the relevant period in this case, which she is perpetually logged into and which is registered under her legal name.

168. Plaintiff Alice Kleinschmidt has been a patient of Defendant McLaren since approximately 2018 and Karmanos since approximately January 2025 and has used Defendants' Websites multiple times during that period. She generally accessed the Websites on her iPhone mobile device and also at times using the Google Chrome browser on her laptop. During the relevant time period, when the Tracking Tools were present, Plaintiff Kleinschmidt used Defendants' Websites to book healthcare and cancer care appointments.

169. Plaintiff Kleinschmidt has maintained an active Facebook account throughout the relevant period in this case, which she is perpetually logged into and which is registered under her legal name.

170. Contemporaneously with the interception and transmission of Plaintiffs' communications on Defendants' websites, Defendants also disclosed to third parties Plaintiffs' personal identifiers, including but not limited to their IP address and persistent identifiers including Facebook IDs.

171. Plaintiffs reasonably expected that their communications with Defendants via the Websites were confidential, solely between themselves and Defendants, and that such communications would not be transmitted to or intercepted by a third party.

172. Plaintiffs provided their Private Information to Defendants and trusted that the information would be safeguarded according to Defendants' policies and state and federal law.

173. Further to the systematic process described herein, Defendants assisted the third parties with intercepting Plaintiffs' communications, including those that contained personally identifiable information, protected health information and related confidential information.

174. Defendants assisted these interceptions without Plaintiffs' knowledge, consent or express written authorization.

175. Following her visits to McLaren's Website, Plaintiff Wehrle observed advertisements on her Facebook account related to the care she sought and received through medical providers she viewed on McLaren's Website, specifically relating to mammography.

176. Following her visits to Defendants' Websites, Plaintiff Kleinschmidt observed advertisements on her Facebook account related to the care she sought and received through medical providers she viewed on the Websites, specifically relating to cancer care.

177. Pursuant to the systematic process described in this Complaint, Plaintiffs' Private Information was disclosed to Meta, Google, and LinkedIn, and this data included their PII, PHI, and related confidential information. Defendants intercepted and/or assisted these interceptions without Plaintiffs' knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiffs' Private Information.

178. As Defendants' patients, Plaintiffs reasonably expected that their online communications with Defendants were solely between themselves and Defendants and that such communications would not be transmitted to or disclosed to any third party. But for their status as Defendants' patient, Plaintiffs would not have disclosed their Private Information to Defendants.

179. During their time as patients, Plaintiffs never consented to the use of their Private Information by third parties or to Defendants enabling third parties to access or interpret such information.

180. Notwithstanding, through the Meta Pixel, other Tracking Tools and Conversions API, Defendants transmitted Plaintiffs' Private Information to third parties.

181. Accordingly, during the same transmissions, the Websites routinely provide Meta, Google, and LinkedIn with patients' individual identifiers, along with other information they input into Defendant's Website. This is precisely the type of information that HIPAA requires health care providers to anonymize to protect the privacy of patients. Plaintiffs' and Class Members identities can be (and are) easily determined based on the FID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

182. By way of example, after intercepting and collecting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Meta will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal

interests, work history, relationship status, and other details. Because the user's FID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the FID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

183. Based on the presence of the Meta Pixel and Conversions API, Defendants unlawfully disclosed Plaintiffs' Private Information to Meta, among the other third parties. The presence of Facebook advertisements confirms Defendants' unlawful transmission of Plaintiffs' Private Information to third parties including Meta.

184. In sum, Defendant's Websites transmitted Plaintiff's highly sensitive communications and Private Information to third parties, including communications that contained private and confidential information, without Plaintiffs' knowledge, consent, or express written authorization.

185. Defendants breached Plaintiffs' right to privacy and unlawfully disclosed their Private Information to third parties. Specifically, Plaintiffs had a reasonable expectation of privacy, based on their status as Defendants' patients, that Defendants would not disclose their Private Information to third parties.

186. Defendants did not inform Plaintiffs that they shared Plaintiffs' Private Information with Meta, Google, LinkedIn or any other similar third party.

187. By doing so without Plaintiffs' consent, Defendants breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed Plaintiffs' Private Information.

188. Upon information and belief, as a "redundant" measure to ensure Plaintiffs' and Class Members' Private Information was successfully transmitted to third parties like Meta, Defendants implemented server-based workarounds like Conversions API to send Plaintiffs' and Class Members' Private Information from electronic storage on Defendants' server directly to Meta.

189. Plaintiffs suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to their Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiffs' medical conditions and other confidential information they communicated to Defendants via the Websites.

190. Plaintiffs have a continuing interest in ensuring that future communications with Defendants are protected and safeguarded from future unauthorized disclosure.

191. Plaintiffs did not know (and had no way of reasonably knowing) that their Private Information was intercepted and unlawfully disclosed to third parties because Defendants affirmatively prevented their patients from learning these facts.

**M.** ***Plaintiffs' and Class Members' Expectation of Privacy***

192. Plaintiffs and Class Members were aware of Defendants' duty of confidentiality when they sought medical services from Defendants.

193. Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Defendants, they all had a reasonable expectation that the information would remain private and that Defendants would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

194. Plaintiffs and Class Members would not have used Defendants' Websites, would not have provided their Private Information to Defendants, and would not have paid for Defendants' health care services, or would have paid less for them, had they known that Defendants would disclose their Private Information to third parties.

**N.** ***Defendants' Responsibility for Third-Party Data Collection and Disclosure***

195. Although the third party Tracking Tools perform the technical functions of collecting and disclosing personal data, McLaren and Karmanos bear full legal responsibility for these actions.

196. McLaren and Karmanos made the affirmative decision to implement the Trackers on their Websites. This was a deliberate action requiring Defendants' web administrators to copy the Trackers' tracking code and insert it into the Websites' source codes. Without Defendants' deliberate implementation, Meta,

Google and LinkedIn would have no access to the personal data of Defendants' Websites' visitors.

197. Defendants control which pages of their Websites contain the tracking codes and could choose to exclude tracking from sensitive pages where healthcare information is accessed or inputted, yet they chose to implement tracking across these sensitive areas of their Websites.

198. Defendants maintain complete control over their Websites and have the ability to remove or modify the trackers at any time. Their continued use of Tracking Tools represents an ongoing choice to allow third parties to collect personal data from visitors to the respective Websites.

199. By implementing these Tracking Tools, Defendants effectively designated Meta, Google and/or LinkedIn as their agents for the collection, processing, and receipt of Website visitors’ personal data. This agency relationship makes Defendants responsible for the collection and disclosure activities performed by these Tracking Tools on their behalf and for their benefit.

200. Defendants received direct benefits from implementing these trackers, including detailed analytics about Website usage that inform their business and marketing decisions. These benefits further establish Defendants’ responsibility for the data collection practices that generate these analytics.

**O. *Defendants' Failure to Obtain Prior and Specific Informed Consent***

201. McLaren and Karmanos failed to obtain prior, specific, informed and written consent from Website users before collecting and disclosing their personal data to third parties.

202. McLaren and Karmanos's Websites do not present users with any meaningful notification that their personal data, including sensitive health information, is being collected and disclosed to third parties like Meta, Google and LinkedIn for purposes unrelated to healthcare services.

203. Even if the Websites did provide notification through cookie banners or similar mechanisms, such notification would fall far short as it would neither inform users of the specific personal data being collected and disclosed, nor obtain their written consent for such disclosure.

204. Importantly, McLaren and Karmanos present their Privacy Policy in the form of a browsewrap agreement. Users are not required to manifest express assent to the Privacy Policy or Terms of Service in order to use the Websites. For the McLaren Website, users can only access these policies by scrolling to the bottom of a page and clicking a hyperlink in small letters, which is buried among many other links. This format makes it highly unlikely that users would even be aware of the existence of the Privacy Policy, let alone its contents.

205. For the Karmanos Website, the situation is even more problematic, as the Privacy Policy is not included on the Website's homepage at all, and is available only through an active search on the Website's search bar.

206. Further, McLaren and Karmanos's shared Terms of Service and Privacy Policy are largely devoid of any clear disclosure regarding the collection, use, and disclosure of patients' personal data, particularly by third-party trackers. While the policies acknowledge the use of cookies and tracking technologies, they fail to disclose the full extent of information collected and shared with third parties like Meta, Google and LinkedIn.

207. The Privacy Policy acknowledges that it collects "personal information provided by users of the Services," but it misleadingly suggests that it collects this information only for its own use, rather than disclosing it to third. The Policy further states: "We are responsible for the protection of all personal information in our custody or control, including any personal information that is transferred to third parties for processing, storage or other purposes," yet McLaren and Karmanos fail to actually protect this information as they claim.

208. The Privacy Policy also fails to properly disclose the extent of information transmitted to Google. While the Policy claims that "Google Analytics collects only the IP address assigned to you on the date you visit this site, rather than your name or other identifying information," it fails to address the fact that Google

Analytics also collects unique identifiers through cookies, which can be linked to users' Google accounts, making the data personally identifiable.

209. The Privacy Policy further states: "We treat information collected by cookies and other technologies as non-personal information." This statement is false and misleading, as the evidence presented in this Complaint demonstrates that the combination of cookies, IP addresses, and health-related website interactions creates personally identifiable information that constitutes "personal data" under the Act.

210. In fact, McLaren and Karmanos are in violation of their own Privacy Policy, which defines Personally Identifiable Information as "information that identifies you as an individual, such as name, birth date, telephone number, e-mail address, or unique device identifiers that was gathered in connection with your use of the Services." As demonstrated in this Complaint, McLaren and Karmanos disclose precisely this type of information—unique device identifiers through cookies—to Google and LinkedIn, as well as IP addresses to LinkedIn, along with health-related search queries and Website interactions.

211. Similarly, while the Privacy Policy states that "if we combine Personally Identifiable Information with protected health information subject to protection under HIPAA, the combined information will be treated as protected health information for as long as it remains combined," the evidence shows that McLaren and Karmanos routinely combine unique identifiers with protected health

information and disclose this combined information to Google and LinkedIn without proper notice or consent.

212. The evidence presented in this Complaint demonstrates that McLaren and Karmanos's Privacy Policy and Terms of Service are contradictory and misleading, as they fail to accurately disclose the nature and extent of personal data collection and disclosure occurring through their Websites.

**P. *Defendants Were Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures***

213. The primary motivation and a determining factor in Defendants' interception and disclosure of Plaintiffs' and Class Members' Private Information was the use of patient data for advertising in the absence of express written consent, which amounts to criminal and tortious acts in violation of federal and state laws. Defendants' further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendants are compensated by the third parties in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

214. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

215. Upon information and belief, as part of their marketing campaigns, Defendants re-targeted patients and potential patients to get more patients to use their services. Defendants did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

216. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendants while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and Michigan law and the common law.

**Q. *Injury to Plaintiffs and Class Members***

217. Defendants' unauthorized collection and disclosure of user communications and their enabling of Meta, Google and LinkedIn's access to this information caused actual harm to Plaintiff and Class members in multiple ways.

218. *Invasion of Privacy:* Medical and health-related information about individuals is highly private, and its disclosure can result in significant embarrassment, stigma, and even discrimination. Plaintiff and Class members suffered an invasion of their privacy through the unauthorized collection and disclosure of their personal data and healthcare-related communications and records. These communications and records included searches for medical specialists, calls to doctors or medical specialists, searches for cancer treatments,

and inquiries about medical conditions such as hemorrhoids, miscarriages, or cervical cancer. The disclosure of these communications and records violated Plaintiffs’ and Class members' reasonable expectation that their interactions with a healthcare provider would remain private.

219. *Loss of Data Value*: Plaintiff and Class members have been deprived of the economic value of their personal data. In today's digital economy, personal data—especially health-related information—has significant commercial value.

220. In a 2014 article by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium. The FTC subsequently brought a lawsuit against one of the data brokers for selling location data regarding people who visit abortion clinics for approximately $160 for a week's worth of data.

221. For years, data harvesting has been one of the fastest growing industries in the United States. Between 2016 and 2018, the value of information mined from Americans increased by 34.7% for Microsoft and 40% for Google. Conservative estimates suggest that in 2018, internet companies earned $202 per American user, and that value was expected to rise to $434 per user, or almost $200 billion industry-wide.

222. In particular, the value of health data is well-known and has been reported on extensively in the news. For example, a 2017 article by Time Magazine

titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" described the extensive market for health data and noted that the market for information was both lucrative and a significant risk to privacy.

223. Similarly, CNBC published an article in 2019 in which it observed that “[d]e-identified patient data has become its own small economy: There’s a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers.”

224. More recently, a 2021 report from Invisibly noted that "because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves." The article further explained that "while a single social security number might go for $0.53, a complete health care record sells for $250 on average" – nearly 500 times as much. According to the report, health care data breaches increased by 55% in 2020.

225. Plaintiffs’ and Class Members’ Private Information has economic value. Meta regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences, and then sells that information to advertisers. Google recognizes the value of user data and even has a pilot program in which it pays users on a weekly basis to track them online.

226. Due to the difficulty in obtaining health information, illegal markets also exist for such personal and sensitive information. NPR reported that health data can be "more expensive than stolen credit card numbers."

227. Further, individuals can sell or monetize their own data if they so choose. A host of companies and applications such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for personal data.

228. In sum, Plaintiffs' and Class members' private and personal data, including their protected information, have a recognized monetary value. McLaren's and Karmanos's unauthorized collection and disclosure of this sensitive personal data deprived Plaintiff and Class members of the economic value of their personal property without proper consideration and has resulted in McLaren and Karmanos unjustly enriching themselves at the expense of Plaintiff and Class members.

229. *Risk of Further Disclosure:* Once collected and disclosed to Google and LinkedIn, Plaintiff's and Class members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially disclosed to additional third parties, causing continued and future harm. For example, Google may combine the health-related data it receives from McLaren and Karmanos with data from its other services (such as Google Search, YouTube, or Gmail) to create

detailed user profiles that include sensitive health information. Similarly, LinkedIn may associate cancer treatment searches or oncologist selections from the Karmanos Website with users' professional profiles, potentially exposing sensitive health information in a professional context.

230. *Statutory Injury:* Independent of the above harms, Defendants caused Plaintiff and Class members to suffer statutory injury, entitling them to the remedies provided by the ECPA, 18 U.S.C. § 2511.

## **CLASS ACTION ALLEGATIONS**

231. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

232. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States who are, or were, patients of Defendants or any of their affiliates, used Defendants' Websites and had their Private Information disclosed to a third party without authorization.

233. Plaintiffs also seek to represent a Michigan Subclass defined as:

> All individuals residing in Michigan who are, or were, patients of Defendants or any of their affiliates, used Defendants' Websites and had their Private Information disclosed to a third party without authorization.

The Nationwide Class and the Michigan Subclass are collectively

referred to as the "Class."

234. Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

235. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

236. Numerosity, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose Private Information may have been improperly disclosed to Meta, Google and LinkedIn, and the Class is identifiable within Defendants' records.

237. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendants had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendants breached their duties to Plaintiffs and Class Members;

e. Whether Defendants' conduct violated the ECPA, 18 U.S.C. § 2511;

f. Whether Defendants' conduct constituted an intrusion upon seclusion;

g. Whether Defendants' conduct breached an implied contract between Defendant and Plaintiff and Class Members;

h. Whether Defendants were unjustly enriched by disclosing Plaintiffs' and Class Members' Private Information;

i. Whether Defendants were negligent;

j. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages because of Defendants' wrongful conduct; and

k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced because of Defendants' disclosure of their Private Information.

238. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised because of Defendants' use of Tracking Tools on their Websites, due to Defendants' misfeasance.

239. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

240. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class

Members, who could not individually afford to litigate a complex claim against large corporations like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

241. Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

242. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be

recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

243. The litigation of the claims is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

244. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

245. Unless a class-wide injunction is issued, Defendants may continue disclosing the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendants may continue to act unlawfully as set forth in this Complaint.

246. Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief regarding the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

247. Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to, the following:

a. Whether Defendants owed a legal duty not to disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief because of Defendant's wrongful conduct.

## COUNT I
## BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
## (On Behalf of Plaintiffs and the Class)

248. Plaintiffs incorporate all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

249. Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

250. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendants, including communications exchanged on Defendants' Websites.

251. In light of the special relationship between Defendants and Plaintiffs and Class Members, whereby Defendants became guardians of Plaintiffs' and Class Members' Private Information, Defendants became fiduciaries by their undertaking and guardianship of the Private Information, to act primarily for the benefit of their patients, including Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendants did and do store and disclose.

252. Contrary to their duties as medical providers, and their express and implied promises of confidentiality, Defendants installed the Tracking Tools to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendants, including Private Information and the contents of such information.

253. These disclosures were made for commercial purposes without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

254. The unauthorized disclosures of Plaintiffs' and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment.

255. Alternatively, the disclosures of Plaintiffs' and Class Members' Private Information occurred because of Defendants' negligent hiring or supervision of their employees, their failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or their failure to train their employees to properly discharge their duties under those policies and procedures.

256. The third party recipients included, but may not be limited to, Meta, Google, and LinkedIn. Such information was received by these third parties in a manner that allowed them to identify Plaintiffs and the individual Class Members.

257. Defendants' breaches of the common law implied covenant of trust and confidence are evidenced by their failure to comply with federal and state privacy regulations, including:

a. By failing to ensure the confidentiality and integrity of electronic PHI Defendants created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b. By failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. By failing to obtain satisfactory assurances, including in writing, that their business associates and/or subcontractors would appropriately safeguard Plaintiffs' and Class Members PHI;

e. By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g. By impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

h. By failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce

to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

i. By failing to keep Private Information confidential as required by MCL 333.20201; and

j. By otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

258. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of the essential confidential relationship between the health care provider and the patient.

259. As a direct and proximate cause of Defendants' unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class members were damaged by Defendants' breach in that:

a. Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private;

b. Plaintiffs and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendants eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

h. Defendants' actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i. Defendants' actions violated the property rights Plaintiffs and Class members have in their Private Information.

**COUNT II**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiffs and the Class)**

260. Plaintiffs incorporate the prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

261. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

262. The ECPA protects both sent and received communications.

263. Plaintiffs' and Class Members' interactions with Defendants' Websites are electronic communications under the ECPA.

264. By utilizing and embedding the Tracking Tools and workarounds such as CAPI on their Websites and/or servers, Defendants intentionally intercepted,

endeavored to intercept and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

265. Specifically, Defendants intercepted Plaintiffs' and Class Members' electronic communications via the Tracking Tools and CAPI (or other workarounds), which tracked, stored and unlawfully disclosed Plaintiffs' and Class Members' Private Information to Meta, Google, and LinkedIn.

266. Furthermore, Defendants intercepted the "contents" of Plaintiffs' communications in at least the following forms:

a. The parties to the communications;

b. PII such as patients' IP addresses, Facebook IDs, cid parameter cookie, browser fingerprints and other unique identifiers;

c. The precise text of patient communications about specific medical conditions;

d. The details of information generated when patients requested or made appointments,

e. The details of information generated when patients signed up for classes;

f. The details of patient communications about billing and payment;

g. The precise dates and times when patients click to Log-In on Defendants' Website.

267. Defendants intercepted communications that included, but are not limited to, communications to/from Plaintiffs and Class Members regarding Private Information, including their unique personal identifiers such as their Facebook ID, IP address, other unique personal identifiers and health information.

268. Whenever Plaintiffs and Class Members interacted with Defendants' Websites, Defendants, through the Tracking Tools they embedded and operated on their Websites, contemporaneously and intentionally redirected the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Meta, Google, and LinkedIn.

269. Defendants intentionally used wire or electronic communications to increase their revenues. Defendants specifically used the Tracking Tools and CAPI (or other workarounds) to track and utilize Plaintiffs' and Class Members' Private Information for their own financial benefit.

270. Defendants were not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communications.

271. Plaintiffs and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the Tracking Tools including the Pixels and Conversions API.

272. Any purported consent that Defendants received from Plaintiffs and Class Members was not valid.

273. Defendants intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State—namely, violations of HIPAA and invasion of privacy, among others.

274. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendants' Websites, looking up specific providers and/or treatments, and scheduling appointments, Defendants' purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation or matter that would be highly offensive to a reasonable person.

275. Defendants' acquisition of patient communications that were used and disclosed to Meta, Google, and LinkedIn was also done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Michigan, including various common law causes of action.

276. Additionally, through the above-described tracking technologies and intercepted communications, this information was, in turn, used by Meta, Google, and LinkedIn to 1) place Plaintiffs in specific health-related categories and 2) target

Plaintiffs with particular advertising associated with Plaintiffs' specific health conditions.

277. Plaintiffs and Class Members have damages as a direct and proximate result of Defendants' invasion of privacy in that:

a. Learning that Defendants have intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, health care providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff sand the Class Members to suffer emotional distress;

b. Defendants received substantial financial benefits from their use of Plaintiffs' and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiffs or Class Members;

c. Defendants received substantial, quantifiable value from their use of Plaintiffs' and Class Members' individually-identifiable patient health information, such as understanding how people use their Websites and determining what ads people see on the Websites, without providing any value or benefit to Plaintiffs or Class Members;

d. Defendants have failed to provide Plaintiffs and Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendants making sensitive and confidential information, such as patient status, conditions, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

278. As a result of Defendants' violations of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT III**
**INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiffs and the Class)**

279. Plaintiffs incorporate the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

280. Michigan recognizes the common law tort of invasion of privacy, including the form known as intrusion upon seclusion. This privacy tort protects

against intrusion upon the plaintiff's seclusion or solitude, or into his or her private affairs.

281. Plaintiffs and Class members had a reasonable expectation of privacy in their communications with McLaren and Karmanos regarding their healthcare needs, medical conditions, and treatment preferences.

282. McLaren and Karmanos intentionally intruded upon the seclusion and private affairs of Plaintiff and Class Members by implementing Trackers on their Websites that collected sensitive, personal health information without proper authorization or consent.

283. McLaren and Karmanos intentionally intruded upon Plaintiff's and Class members' seclusion by implementing the Trackers on their Websites, enabling the interception of their private communications and their disclosure to Google and LinkedIn without their knowledge or consent.

284. McLaren's and Karmanos's intrusion upon Plaintiff's and Class members' private communications would be highly offensive to a reasonable person. Internet users have a reasonable expectation that their personally identifiable communications with healthcare providers' Websites will remain private, particularly when those communications involve sensitive health-related matters such as cancer treatment, reproductive health, and other medical conditions.

285. McLaren's and Karmanos's intrusion was intentional, as they deliberately implemented the Trackers on their Websites to capture user communications for their own business purposes.

286. As a direct and proximate result of McLaren's and Karmanos's invasion of their privacy, Plaintiff and Class members have suffered injury, including loss of their reasonable expectation of privacy and diminution in the value of their personal information.

287. Plaintiff and Class members are entitled to damages, including compensatory and punitive damages, in an amount to be determined at trial.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
## (on behalf of Plaintiffs and the Class)

288. Plaintiffs incorporate the prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

289. As a condition of utilizing Defendants' Websites and receiving services from Defendants' health care facilities and professionals, Plaintiffs and Class Members provided their Private Information and compensation for their medical care.

290. When Plaintiffs and Class Members provided their Private Information to Defendants, they entered an implied contract pursuant to which Defendants agreed to safeguard and not disclose their Private Information without consent.

291. Plaintiffs and Class Members would not have entrusted Defendants with their Private Information in the absence of an implied contract between them and Defendants obligating Defendants to not disclose Private Information without consent.

292. Plaintiffs and Class Members would not have retained Defendants to provide health care services in the absence of an implied contract between them and Defendants obligating Defendants to not disclose Private Information without consent.

293. Defendants breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information without consent to third parties like Facebook, Google, and LinkedIn.

294. As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

295. Plaintiffs and Class Members are entitled to compensatory and consequential damages because of Defendants' breach of implied contract.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

296. Plaintiffs incorporate the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class and plead this Count in the alternative.

297. Defendants benefit from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

298. Plaintiffs and Class Members conferred a benefit upon Defendants in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendants.

299. Defendants exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation.

300. Defendants unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendants' conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

301. The benefits that Defendants derived from Plaintiffs and Class Members were not offered by Plaintiffs and Class Members gratuitously and rightly belong to Plaintiffs and Class Members. It would be against equity and good

conscience for Defendants to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

302. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**NEGLIGENCE**
**(On behalf of Plaintiffs and the Class)**

303. Plaintiffs incorporate the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

304. Defendants owed Plaintiffs and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

305. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendants, including communications exchanged on Defendants' Websites.

306. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendants installed the Tracking Tools to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendants, including Private Information and the contents of such information.

307. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

308. The third-party recipients included, but may not be limited to, Meta, Google, and LinkedIn.

309. As a direct and proximate cause of Defendants' unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendants' breach in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendants eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

h. Defendants' actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i. Defendants' actions violated the property rights Plaintiffs and Class Members have in their Private Information.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B. For equitable relief requiring Defendants to cease collecting and disclosing Website users' communications without proper consent; destroy all user data collected through the Trackers; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

C. For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

D. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

E. For prejudgment interest on all amounts awarded; and

F. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

DATE: September 8, 2025

Respectfully submitted,

*/s/ Nicholas A. Coulson*
Nicholas A. Coulson
Julia G. Haghighi
**COULSON P.C.**
300 River Place Drive
Detroit, MI 48207
T: (313) 644-2685
E: nick@coulsonpc.com
jprescott@coulsonpc.com

Katrina Carroll, Esq.*
Kyle Shamberg, Esq.*
CARROLL SHAMBERG LLC
111 W. Washington Street
Suite 1240
Chicago, IL 60602
Tel. 872-215-6205
katrina@csclassactions.com
kyle@csclassactions.com

David H. Fink (P28235)
Nathan J. Fink (P75185)
FINK BRESSACK
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
(248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

Don Bivens*
don@donbivens.com

DON BIVENS, PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 762-2661

**pro hac vice* forthcoming

***Counsel for Plaintiffs and the Putative Class***